REVISED, July 27, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No.  96-20886

_____

KENNTH CRAIG BRADY, ET AL,

Plaintiffs,

KENNETH CRAIG BRADY; BOBBY LEE EVANS; WILLIAM E
FORTENBERRY; JAMES ARTHUR LEACH; STEPHEN LEON SKINNER;
GUY "NUBBIN" CHAMBLEE,

Plaintiffs-Appellees-Cross-Appellants,

v.

FORT BEND COUNTY, ET AL,

Defendants,

FORT BEND COUNTY,

Defendant-Appellant-Cross-Appellee.

_____

ANTONIO O ROSAS,

Plaintiff-Appellee-Cross-Appellant,

v.

FORT BEND COUNTY, ET AL,

Defendants,

FORT BEND COUNTY,

Defendant-Appellant-Cross-Appellee.

_____

July 2, 1998

Before KING, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

KING, Circuit Judge:

Defendant Fort Bend County appeals the district court's entry of judgment in favor of plaintiffs Kenneth Craig Brady, Guy "Nubbin" Chamblee, Bobby Lee Evans, William Fortenberry, James Leach, Stephen Leon Skinner, and Antonio O. Rosas based upon a jury verdict in favor of plaintiffs on their claims under 42 U.S.C. § 1983 that R. George Molina, the former sheriff of Fort Bend County, failed to rehire them based upon their exercise of their First Amendment rights of free speech and association. For the reasons set forth below, we affirm the district court's judgment.

## I. FACTUAL BACKGROUND

In 1992, R. George Molina, a Democrat, ran for sheriff of Fort Bend County, Texas, against the Republican incumbent, Perry Hillegeist. At that time, plaintiffs Kenneth Craig Brady, Guy "Nubbin" Chamblee, Bobby Lee Evans, William Fortenberry, James Leach, Stephen Leon Skinner, and Antonio O. Rosas (collectively, the Plaintiffs) worked under Hillegeist as deputy sheriffs in the Fort Bend County Sheriff's Department. Brady was the lieutenant of the detective bureau of the sheriff's department. Chamblee was a detective sergeant in narcotics. Evans was a patrol

2

sergeant. Fortenberry was the lieutenant in charge of the county jail, and Leach was a sergeant supervised by Fortenberry. Skinner was a patrol deputy. Rosas was the sergeant who supervised the warrants division.

Each of the Plaintiffs supported Hillegeist's bid for re-election. Although their levels of participation varied, the Plaintiffs generally supported Hillegeist by attending rallies, posting signs, and campaigning door-to-door. Molina won the election in November 1992. That month, he appointed a transition team to determine which of the sheriff's department's current employees would be reappointed under his administration. The transition team met on November 4, 1992, and on December 1 or 2, 1992. On December 4, 1992, Molina delivered letters to the Plaintiffs stating that they would not be rehired on January 1, 1993. On December 31, 1992, Molina was sworn into office. Under Texas law, the Plaintiffs' terms as deputies expired automatically when Hillegeist's tenure of office expired on December 31, 1992. See Abbott v. Pollock, 946 S.W.2d 513, 517 (Tex. App.--Austin 1997, writ denied); El Paso County Sheriff's Deputies' Ass'n v. Samaniego, 802 S.W.2d 727, 728 (Tex. App.--El Paso 1990, writ denied). On January 1, 1993, Molina, now officially occupying the office of sheriff, reaffirmed his decision not to rehire the Plaintiffs and signed letters to this effect.

## II.  PROCEDURAL BACKGROUND

On February 16, 1993, Brady sued Fort Bend County (the County) and Molina in federal district court under 42 U.S.C. § 1983, alleging that Molina failed to rehire him on the basis of his political support for Hillegeist in the sheriff's race and that this action constituted a violation of the First Amendment. Evans, Fortenberry, Leach, Skinner, and Chamblee subsequently joined as plaintiffs in the action.  On June 30, 1993, the County moved for summary judgment, and Molina also moved for summary judgment based on qualified immunity.  The district court denied both motions.  Molina appealed, and a panel of this court affirmed the district court's denial of summary judgment.  See Brady v. Fort Bend County, 58 F.3d 173, 176 (5th Cir. 1995).  The court then granted Molina's suggestion of rehearing en banc.  See id.

On July 21, 1994, while en banc consideration of Molina's appeal in Brady's suit was pending, Rosas filed a separate action against the County and Molina.  The County and Molina both moved to dismiss.  The district court denied their motions, and Molina filed another appeal.  The Plaintiffs voluntarily dismissed Molina as a party defendant in both the Brady and Rosas suits. As a result, this court dismissed both appeals.  The Rosas and Brady suits were then consolidated at the district court level.

4

On June 3, 1996, trial commenced. The County moved for judgment as a matter of law at the close of the Plaintiffs' case and at the close of the evidence. The district court denied these motions. On June 19, 1996, the jury returned a verdict in favor of all of the Plaintiffs, awarding damages for back pay to all of the Plaintiffs, back benefits to all of the Plaintiffs except Chamblee, Evans, and Skinner and mental anguish to all of the Plaintiffs.[1] The County moved for judgment as a matter of law, a new trial, or remittitur. The district court granted the County's motion in part and set aside the jury's award of mental anguish damages as to all of the Plaintiffs except Skinner on the ground that insufficient evidence supported these awards. It denied the motion in all other respects. On August 15, 1996, the district court entered final judgment consistent with the jury's verdict except that it awarded mental anguish damages only to Skinner. The district court also awarded the Plaintiffs prejudgment interest on back pay and attorney's fees of $751,370.75. Additionally, the district court ordered reinstatement of the Plaintiffs but stayed the reinstatement pending appeal.

The County timely filed a notice of appeal, and all of the Plaintiffs except Skinner cross-appealed the district court's

---

[1] The jury awarded $25,000 in mental anguish damages to Rosas, $15,000 to Leach, and $10,000 to each of the other Plaintiffs.

partial grant of the County's motion for judgment as a matter of law on the issue of mental anguish damages.

## III. DISCUSSION

The County appeals the district court's judgment in favor of the Plaintiffs on the following grounds:

1. As a matter of law, the County is not liable for Molina's hiring decisions because Molina was not a final policymaker regarding the County's employment policy.

2. First Amendment law should defer to a state's right to decide, as Texas has done, whether patronage practices will exist as part of political systems.

3. The County's interest in efficiency in the services that it provides through its employees outweighed the interests of the Plaintiffs in engaging in political activity in support of Hillegeist.

4. Molina's actions could not have violated the Plaintiffs' First Amendment rights because he merely failed to rehire them as opposed to discharging them before their terms expired.

5. The district court erred in instructing the jury that the County was required to prove that Molina

6

possessed legitimate reasons for his failure to rehire the Plaintiffs by a preponderance of the evidence.

6. Insufficient evidence exists to support the jury's conclusion that Molina's decision not to rehire the Plaintiffs was based upon their political support for Hillegeist.

7. The district court erred in admitting certain testimony from one of the Plaintiffs' witnesses because the testimony was irrelevant and prejudicial.

8. The district court's award of attorney's fees is supported by insufficient evidence.

All of the Plaintiffs except Skinner contend on appeal that the district court erred in partially granting the County's motion for judgment as a matter of law and setting aside their awards of damages for mental anguish. We consider each of these issues in turn.

## A. Whether Molina Was a Final Policymaker

The County correctly observes that municipal liability for constitutional torts arises when the execution of an official policy or custom of the municipality causes the constitutional injury. See Monell v. Department of Soc. Servs., 436 U.S. 658, 694 (1978). It also recognizes that a single action by a

7

municipal official possessing final policymaking authority regarding the action in question constitutes the official policy of the municipality and that the determination of whether a municipal official wields final policymaking authority regarding a particular action constitutes a question of state law.  See McMillian v. Monroe County, 117 S. Ct. 1734, 1736-37 (1997).  The County contends that Molina was not acting in a capacity as the County's final policymaker when it declined to rehire the Plaintiffs.  In support of this contention, the County relies on the following passage from Justice Brennan's opinion in Pembaur v. City of Cincinnati, 475 U.S. 469 (1986):

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official--even a policymaking official--has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.  The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.[12]
>
> _____
>
> [12] Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy.  If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability.  Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability.  This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that

8

> discretion in an unconstitutional manner; the decision
> to act unlawfully would not be a decision of the Board.

Id. at 484 & n.12 (citations and other footnotes omitted).

The County argues that Molina is analogous to the hypothetical sheriff in Pembaur. The County concedes that, under Texas law, Molina constituted its final policymaker with respect to law enforcement and that his actions in this capacity could form a basis for county liability. See Turner v. Upton County, 915 F.2d 133, 136 (5th Cir. 1990) (holding that, in Texas, a sheriff wields final policymaking authority in the county regarding law enforcement). However, it contends that he did not constitute a final policymaker with respect to county employment policy generally and thus that his failure to rehire the Plaintiffs cannot subject the County to liability. The County observes that the Texas Local Government Code requires the sheriff to apply to the commissioners court of the county for authorization to appoint employees. See TEX. LOC. GOV'T CODE ANN. § 151.001 (Vernon 1988). It further notes that the commissioners court establishes the classifications of employees in the sheriff's department and sets the salaries for each classification. See id. § 152.071. The County also observes that the commissioners court establishes policy regarding the entitlement of numerous classes of county employees to benefits such as health and accident insurance. See id. § 157.002 (Vernon Supp. 1998). The County therefore argues that the commissioners

court, rather than the sheriff, constitutes the final policymaker regarding county employment policy.

The County correctly observes that we would paint with too broad a brush were we to conclude that the County may be liable for constitutional injury arising from Molina's decision not to rehire the Plaintiffs because he constituted the County's final policymaker with respect to law enforcement.  As the Supreme Court recently observed, in determining whether Molina constituted a "policymaker" for the County, the relevant inquiry "is not whether [he] act[ed] for . . . [the County] in some categorical, 'all or nothing' manner."  McMillian, 117 S. Ct. at 1737.  Rather, the Court's "cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue."  Id. at 1737 (emphasis added); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality opinion) (observing that, in order for municipal liability to attach based upon an unconstitutional act by its official or officials, "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the [municipality's] business").  However, the County's argument goes astray because it then urges us to paint with too broad a brush and hold that Molina did not act as the County's final policymaker when he

10

declined to rehire the Plaintiffs because Molina did not establish the County's employment policy generally. Rather, the appropriate inquiry is whether the sheriff is the County's final policymaker with respect to the specific action at issue here-- filling available employment positions in the sheriff's department. With respect to this specific act, Texas law unequivocally vests the sheriff with final policymaking authority. Section 85.003(c) of the Texas Local Government Code provides that deputies "serve[] at the pleasure of the sheriff." TEX. LOC. GOV'T CODE ANN. § 85.003(c) (Vernon 1988). Moreover, § 151.004 prohibits the commissioners court from exercising any influence over whom the sheriff appoints to serve as deputies. See id. § 151.004. As one Texas court of appeals has observed,

> By including such provision in the law, the Legislature established a public policy to the effect that officers elected by the people to discharge public trusts and upon whose shoulders rests the responsibility for their proper discharge should be free to select persons of their own choice to assist them in the discharge of the duties of their officers.

Murray v. Harris, 112 S.W.2d 1091, 1093 (Tex. Civ. App.--Amarillo 1938, writ dism'd); see also Commissioners Court v. Ross, 809 S.W.2d 754, 756 (Tex. App.--Tyler 1991, no writ) ("The commissioners court may limit the number of deputies authorized, but it has no power over naming the individuals to be appointed.").

Sheriffs under Texas law are unlike the hypothetical sheriff discussed in Pembaur because a Texas sheriff is not merely

11

granted "discretion to hire and fire employees" by the commissioners court. Pembaur, 475 U.S. at 484 n.12. Rather, the Texas legislature has vested sheriffs with such discretion, and the sheriff's exercise of that discretion is unreviewable by any other official or governmental body in the county. Texas sheriffs therefore exercise final policymaking authority with respect to the determination of how to fill employment positions in the county sheriff's department. See Turner, 915 F.2d at 136 ("'Because of the unique structure of county government in Texas . . . elected county officials, such as the sheriff . . . hold[ ] virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein . . . . Thus, at least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one "whose edicts or acts may fairly be said to represent official policy" for which the county may be held responsible under section 1983.'" (quoting Familias Unidas v. Briscoe, 619 F.2d 391, 404 (5th Cir. 1980) (quoting Monell, 436 U.S. at 694))) (alterations in original)); see also Davis v. Ector County, 40 F.3d 777, 784 (5th Cir. 1994) (holding that a Texas district attorney's termination of an employee under his supervision constituted an act of final policymaking authority within the county because he "enjoyed free reign over the

District Attorney's office and set department policy without oversight").[2]

The County argues, however, that the commissioners court possesses an indirect ability to control the sheriff's exercise of discretion to hire and fire deputies because it determines the number of deputy positions that the sheriff will be allowed to fill. See TEX. LOC. GOV'T CODE ANN. § 151.001; Ross, 809 S.W.2d at 756. We acknowledge that a plurality of the Supreme Court has stated that, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making," that official does not wield final policymaking authority with respect to his discretionary actions. Praprotnik, 485 U.S. at 127 (plurality opinion). However, the Court's later decision in Jett v. Dallas Independent School District, 491 U.S. 701 (1989),

_____

[2] The County contends that this court's decision in Gunaca v. Texas, 65 F.3d 467 (5th Cir. 1995), mandates a conclusion that Molina did not act as a final policymaker in choosing not to rehire the Plaintiffs. In Gunaca, the plaintiff, a county investigator, argued that the defendant county was liable for the district attorney's dismissal of the plaintiff on the basis of his political affiliation. See id. at 473 n.5. The county argued that no municipal liability existed because, "under Texas law, the district attorney possesses exclusive authority to hire and fire investigators." Id. The plaintiff's sole response to this argument was that the county could nonetheless be liable for the patronage dismissal because "municipal officials controlled investigators' salary and employment benefits." Id. A review of the Gunaca opinion and the briefs filed in that case reveals that the plaintiff did not argue that the fact that the district attorney had exclusive discretion in the hiring and firing of investigators rendered him the county's policymaker in this regard, which would give rise to municipal liability. Gunaca therefore does not control our decision in this case.

13

implies that the type of indirect constraint to which the County refers does not indicate that an official does not possess final policymaking authority.

In Jett, the petitioner brought suit under 42 U.S.C. §§ 1981 and 1983, contending that his transfer from a coaching position by the superintendent of the Dallas Independent School District (DISD) violated his constitutional rights to due process and equal protection. See id. at 707. The petitioner further argued that DISD was liable for the superintendent's actions. See id. After concluding that § 1983 "provides the exclusive federal damages remedy for the violation of rights guaranteed by § 1981 when the claim is pressed against a state actor," see id. at 735, the Court remanded the case for a determination of whether DISD's superintendent wielded final policymaking authority "concerning the transfer of school district personnel." Id. at 738 (emphasis added). This statement of the issue to be resolved by the Court of Appeals on remand indicates that it was unnecessary for the superintendent to exercise final policymaking authority over other aspects of school district employment policy, such as hiring and firing school district personnel. To the extent that final policymaking authority regarding the hiring and firing of school district personnel was vested in an official other than the superintendent, that other official could certainly "constrain" the superintendent's exercise of authority to transfer school district personnel by simply firing the

14

individuals that the superintendent wished to transfer.  This is precisely the sort of indirect constraint that the commissioners court can place upon the sheriff's exercise of his authority to hire and fire deputies.  That the municipal official need only exercise final policymaking authority with respect to the specific action allegedly constituting a constitutional tort thus indicates that the sort of indirect constraint that the County contends limits a Texas sheriff's discretion in hiring and firing deputies does not indicate a lack of final policymaking authority on the part of the sheriff regarding such decisions.

The County further argues that sheriffs do not possess final policymaking authority with regard to filling employment positions in the sheriff's department because the Texas legislature has authorized the creation of a civil service commission empowered to "adopt, publish, and enforce rules regarding . . . matters relating to the selection of employees and the procedural and substantive rights, advancement, benefits, and working conditions of employees."  TEX. LOC. GOV'T CODE ANN. § 158.035(a) (Vernon Supp. 1998).  However, establishment of a civil service commission requires a petition by at least twenty percent of the employees of the sheriff's department requesting the creation of a civil service system as well as a majority of the employees in the department in favor of the creation of such a system.  See id. §§ 158.033-.034 (Vernon 1988 & Supp. 1998).  No such system existed in the County when Molina took office.

15

Thus, for the time period relevant to this lawsuit, final policymaking authority regarding the selection of deputies remained vested in the sheriff of the County.[3]

The County next argues that Molina clearly did not exercise final policymaking authority with respect to the appointment of deputies to available employment positions on December 4, 1992, when he delivered the letters to the Plaintiffs indicating that he did not intend to rehire them. This argument is devoid of merit because, once Molina assumed office, he reaffirmed his intention not to rehire the Plaintiffs and gave effect to that intent by not rehiring the Plaintiffs. After Molina took office, he was a state actor wielding the policymaking authority described above with respect to filling available deputy positions in the sheriff's department.

Finally, the County contends that, because Texas sheriffs possess "unfettered authority to appoint deputies," a conclusion that the sheriff wields final policymaking authority with respect to filling available deputy positions "subjects every Texas county to recurring lawsuits after every election even though the counties are forbidden from interfering in the Sheriff's

---

[3] We note that, even if the County's sheriff's department were to adopt a civil service system, doing so would not strip the sheriff of all final policymaking authority regarding the selection of deputies. This is so because the Local Government Code provides that the sheriff retains the ability to exempt a certain number of positions within the department from the civil service system. See TEX. LOC. GOV'T CODE ANN. § 158.038 (Vernon Supp. 1998).

16

appointment decisions."  As indicated above, however, the fact that under Texas law, no other official or governmental entity of the county exerts any control over the sheriff's discretion in filling available deputy positions is what indicates that the sheriff constitutes the county's final policymaker in this area.[4] We therefore conclude that, when Molina failed to rehire the Plaintiffs, he acted in a final policymaking capacity.  As such, if his decision not to rehire the Plaintiffs constituted an infringement of their First Amendment rights, the County is liable for the consequences of that decision.

**B.  Whether Molina's Failure to Rehire the Plaintiffs Violated Their First Amendment Rights**

The County advances a number of arguments as to why Molina's failure to rehire the Plaintiffs, even if motivated by their political activities in support of Hillegeist, nonetheless did not violate their First Amendment rights.  We consider each of these arguments in turn.

---

[4]  The County does not contend that it is not liable for the sheriff's unconstitutional employment practices on the ground that, under Texas law, sheriffs act as state policymakers as opposed to county policymakers in filling available deputy positions.  See McMillian, 117 S. Ct. at 1740 (holding that an Alabama county was not liable for the constitutional torts resulting from the law enforcement policy of the county's sheriff because, under Alabama law, sheriffs acting in a law enforcement capacity constitute officers of the state rather than the county).  We therefore do not address this issue.

17

### 1. Texas's "right" to allow employment decisions on the basis of political affiliation

The County first observes that, through relevant provisions of the Texas Local Government Code, the Texas Legislature has manifested a clear intention that deputy sheriffs "serve[] at the pleasure of the sheriff." TEX. LOC. GOV'T CODE ANN. § 85.003. It contends that "[w]hether to endorse a patronage system is a policy decision that should be left to the judgment of the people's elected representatives." The County therefore argues that our First Amendment jurisprudence should "defer" to Texas's "right to decide . . . whether patronage practices will exist as part of local political systems." This argument need not detain us long.

For more than two decades, the Supreme Court has consistently held that "the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." Rutan v. Republican Party of Ill., 497 U.S. 62, 64 (1990); see also Branti v. Finkel, 445 U.S. 507 (1980); Elrod v. Burns, 427 U.S. 347 (1976). In essence, the County asks us to overrule the long line of Supreme Court authority placing limits on political patronage practices, along with the substantial body of case law in this circuit interpreting and applying that authority. See, e.g., Kinsey v. Salado Indep. Sch.

18

Dist., 950 F.2d 988 (5th Cir. 1992) (en banc); McBee v. Jim Hogg County, 730 F.2d 1009 (5th Cir. 1984) (en banc). This is something that we obviously lack the authority to do, even if we had the inclination.

In a similar vein, the County argues that the Plaintiffs were well aware that they served at the pleasure of the sheriff and that their tenures ended automatically with the end of the sheriff's term. It therefore contends that the Plaintiffs had no legitimate expectation of, or right to, being rehired by Molina. The County thus claims that Molina's failure to rehire the Plaintiffs, even if based upon their political activities in support of Hillegeist, could not have violated their First Amendment rights. In Perry v. Sindermann, 408 U.S. 593 (1972), the Supreme Court observed that, "[f]or at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." Id. at 597. "The denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly." Elrod, 427 U.S. at 361 (Brennan, J.). In Sherbert v. Verner, 374 U.S. 398 (1963), the Court observed that "[i]t is too late in the day to doubt that the libert[y] of . . . expression may be infringed by the denial of or placing of conditions upon a benefit or

19

privilege." Id. at 404. If it was too late in the day three-and-a-half decades ago to consider the County's argument that the Plaintiffs' First Amendment rights could not have been violated by Molina's failure to rehire them because they had no right or expectation of being rehired, it is certainly too late to consider it now.

The County finally contends that it is unfair to subject it to a new round of lawsuits every four years when a new sheriff is elected merely because Texas law allows patronage dismissals by county sheriffs. The answer to this contention is that, if the Texas legislature wishes to minimize the potential liability of local governments for unconstitutional practices by local governmental officials, it can pass laws constraining the ability of such officials to engage in unconstitutional practices. As the County acknowledges, the legislature has done just that by giving counties the option of creating a civil service system for sheriff's departments that at least limits to some degree the sheriff's ability to engage in unconstitutional hiring practices. The fact that the Fort Bend County Sheriff's Department chose not to utilize this option provides no justification for allowing constitutional violations by the County's sheriff to go unremedied.

## 2. Failure to rehire versus discharge

20

The County next contends that Molina could not have violated the Plaintiffs' First Amendment rights because he merely declined to rehire them rather than firing them. In McBee v. Jim Hogg County, 730 F.2d 1009 (5th Cir. 1984) (en banc), we addressed a factual scenario identical in all material respects to the one at issue here and concluded that "the fact that the deputies were terminated by a 'failure to rehire' rather than a 'dismissal' is irrelevant to the question of whether they were impermissibly terminated for exercising their First Amendment rights." Id. at 1015 (footnote omitted); see also Warnock v. Pecos County, 116 F.3d 776, 779 n.1 (5th Cir. 1997) ("For our purposes, there is no difference between firing and declining to re-appoint.").

The Supreme Court subsequently reached a similar conclusion in Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990), where it determined that the same limitations that the First Amendment imposes upon a public employer's power to discharge employees based upon their political affiliation apply to a public employer's decisions to transfer, recall, and hire on that basis. Id. at 74; cf. Branti, 445 U.S. at 512 n.6 ("[T]he lack of a reasonable expectation of continued employment is not sufficient to justify dismissal based solely upon an employee's private political beliefs."). While Rutan addressed only political patronage, we have applied it to cases involving public employer retaliation for employees' exercise of their right to free speech. See Pierce v. Texas Dep't of Criminal Justice,

21

Institutional Div., 37 F.3d 1146, 1149-50 (5th Cir. 1994); Click

v. Copeland, 970 F.2d 106, 110-11 (5th Cir. 1992).  The County's

claim that a failure to rehire a public employee cannot violate

the employee's First Amendment rights therefore lacks merit.

### 3. Balancing the interests of the County as employer against the interests of the Plaintiffs as citizens

In further support of its contention that Molina's failure

to rehire the Plaintiffs did not violate their First Amendment

rights even if based upon their political activity and

affiliation, the County makes two additional arguments that are

closely intertwined.  First, it argues that sheriff's deputies in

Texas may be freely dismissed on political patronage grounds.

Second, the County argues that governmental interests outweighed

the Plaintiffs' interest in engaging in political activity in

support of Hillegeist.  A summary of the relevant First Amendment

law as established in Supreme Court precedent and as applied in

this circuit will facilitate a clear disposition of these claims.

### a.  Relevant First Amendment law

It is well established that the First Amendment places

certain constraints upon dismissals from public employment based

upon political affiliation and speech.  As noted in Part III.B.1,

supra, limitations on dismissals based upon a public employee's

political affiliation, or political patronage dismissals, emerged

from the Supreme Court's decisions in Elrod v. Burns, 427 U.S.

347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980).  In Elrod,

22

the Court held that "a nonpolicymaking, nonconfidential government employee can[not] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." Elrod, 427 U.S. at 375 (Stewart, J., concurring).[5] In Branti, the Court clarified the rule announced in Elrod regarding when party affiliation may serve as a legitimate basis for terminating a public employee as follows:

> It is equally clear that party affiliation is not necessarily relevant to every policymaking or confidential position. The coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats, or vice versa, no matter which party is in control of the state government. On the other hand, it is equally clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments. In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

Branti, 445 U.S. at 518.

_____

[5] The Elrod court was fractured, with Justice Brennan delivering the judgment of the Court and authoring a "wide-ranging opinion" in which two other justices joined. See Elrod 427 U.S. at 349 (Brennan, J.); id. at 374 (Stewart, J., concurring). However, as the Court recently observed, "five Justices found common ground in the proposition" stated in the text above. O'Hare Truck Serv., Inc. v. City of Northlake, 116 S. Ct. 2353, 2357 (1996).

In Pickering v. Board of Education, 391 U.S. 563 (1968) and Connick v. Myers, 461 U.S. 138 (1983), the Supreme Court held that certain limitations exist on the ability of a government employer to discharge employees based upon the employees' exercise of their right to free expression. Specifically, the Court concluded that the First Amendment precludes a discharge based upon an employee's exercise of his right to free expression if two criteria are satisfied. First, the expression must relate to a matter of public concern. See Connick, 461 U.S. at 146; Kinsey v. Salado Indep. Sch. Dist., 950 F.2d 988, 992 (5th Cir. 1992) (en banc) (plurality opinion). Second, the employee's interest in "commenting upon matters of public concern" must outweigh the public employer's interest "in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568; see also Kinsey, 950 F.2d at 992.

In applying the Supreme Court's jurisprudence concerning public employers' adverse employment actions based upon employees' political affiliation and expression, this court has concluded that factual scenarios in which government employers discharge employees based upon their political affiliation, their exercise of their right to free expression, or some combination thereof "locate themselves on a spectrum." McBee v. Jim Hogg County, 730 F.2d 1009, 1014 (5th Cir. 1984). At one end of the spectrum lie the factual scenarios like the ones at issue in

24

*Elrod* and *Branti*, where the employee was discharged based solely upon grounds of political affiliation. See *id.* We have observed that, in such scenarios, little *Pickering*/*Connick*-style weighing is necessary because the employees are "discharged on the sole ground of their private and--for employment purposes--all but abstract political views. They [have] not campaign[ed], they [have] not even [spoken]: they [have] merely thought." *Id.* at 1014.

At the other end of the spectrum lie factual scenarios in which the government employee's "exercise of his constitutional privileges [has] clearly over-balanced his usefulness as an [employee]." *Id.* (internal quotation marks omitted). We have cited as examples of factual scenarios occupying this position on the spectrum those at issue in *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970), and *Duke v. North Texas State University*, 469 F.2d 829 (5th Cir. 1972), "where instructors had incited student disturbances that were sufficiently serious to call in question the ability of the academic authorities to maintain order on campus." *McBee*, 730 F.2d at 1014.

In circumstances falling between these two polar extremes, we have concluded that *Connick*/*Pickering* balancing constitutes the appropriate inquiry. See *McBee*, 730 F.2d at 1015. The Supreme Court recently confirmed the correctness of this approach in *O'Hare Truck Service, Inc. v. City of Northlake*, 116 S. Ct. 2353 (1996):

25

Elrod and Branti involved instances where the raw test of political affiliation sufficed to show a constitutional violation, without the necessity of an inquiry more detailed than asking whether the requirement was appropriate for the employment in question. There is an advantage in so confining the inquiry where political affiliation alone is concerned, for one's beliefs and allegiances ought not to be subject to probing or testing by the government. It is true, on the other hand, . . . that the inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed. A reasonableness analysis will also accommodate those many cases . . . where specific instances of the employee's speech or expression, which require balancing in the Pickering context, are intermixed with a political affiliation requirement. In those cases, the balancing Pickering mandates will be inevitable. This case-by-case process will allow the courts to consider the necessity of according to the government the discretion it requires in the administration and awarding of contracts over the whole range of public works and the delivery of governmental services.

Id. at 2358.

This summary of the applicable law provides the appropriate frame of reference from which to analyze the County's remaining arguments regarding whether Molina's failure to rehire the Plaintiffs, if based upon their political activities in support of Hillegeist, constituted a violation of the First Amendment.

b.   The County's arguments in the First Amendment's lexicon

The County's first argument--that sheriff's deputies in Texas may be freely dismissed on political patronage grounds-- rests upon a contention that sheriff's deputies occupy a position with respect to which "party affiliation is an appropriate requirement for . . . effective performance." Branti, 445 U.S.

26

at 518.  The County thus argues that, to the extent that Molina was privileged to choose not to rehire the Plaintiffs based solely upon their political beliefs, he was necessarily privileged to choose not to rehire them on the basis of their expression of those beliefs.  The County's second argument--that its interests outweighed the Plaintiffs' interest in engaging in political activity in support of Hillegeist--constitutes a contention that Molina's failure to rehire the Plaintiffs did not violate their First Amendment rights because the Pickering/Connick balance weighs in favor of the County.

We conclude that the County's second argument subsumes its first and that we therefore need only address the second argument.  If we accept the County's second argument, then we have no need to determine whether Molina's failure to rehire the Plaintiffs would have been constitutional had he done so solely on the grounds of the Plaintiffs' political affiliation.  By the same token, if we reject the County's second argument and conclude that Molina's failure to rehire the Plaintiffs was unconstitutional if based upon the combination of their political affiliation and expression of that affiliation, then we necessarily reject the County's argument that Molina's failure to rehire the Plaintiffs was constitutional even if he based the decision solely upon their political affiliation.  Should we conclude that the Plaintiffs' expressive political activity in conjunction with their political affiliation did not sufficiently

27

threaten to undermine the County's interest "in promoting the efficiency of the public services it performs through its employees," Pickering, 391 U.S. at 568, as to render Molina's failure to rehire the Plaintiffs on the basis of this activity constitutional, then we surely could not simultaneously conclude that the Plaintiffs' political beliefs alone threatened to undermine the County's interests to a degree sufficient to justify Molina's failure to rehire the Plaintiffs solely on the basis of their political belief. See Kinsey, 950 F.2d at 993-94; McBee, 730 F.2d at 1014; cf. Kinsey, 950 F.2d at 998-99 (Higginbotham, J., concurring) (concluding that, where the plaintiff superintendent claimed that the school board suspended him based upon both his political affiliation and speech on a matter of public concern, consideration of the plaintiff's speech was unnecessary because the fact that party affiliation was an appropriate requirement for the superintendent position of itself demonstrated that the suspension did not violate the plaintiff's First Amendment rights).

We therefore confine our inquiry to an application of the Pickering/Connick balance to determine whether Molina's failure to rehire the Plaintiffs, if based upon their political activity in support of Hillegeist, violated their First Amendment rights.

### c. The Pickering/Connick balance

As noted earlier, we must determine, as a threshold matter, whether the expressive activity that the Plaintiffs contend

28

motivated Molina's failure to rehire them constituted comment on a matter of public concern.  See Connick, 461 U.S. at 146; Kinsey, 950 F.2d at 992.  While speech need not touch on a matter of public concern to possess First Amendment protection,

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Connick, 461 U.S. at 147.  Therefore, if the Plaintiffs' expressive activity "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for [Molina's failure to rehire them]."  Id. at 146.

We determine whether the Plaintiffs' expressive activity in this case constituted speech on a matter of public concern based upon its "content, form, and context . . . as revealed by the whole record."  Id. at 147-48; Kinsey, 950 F.2d at 992.  The Plaintiffs testified that they engaged in a wide variety of political activity in support of Hillegeist.  Fortenberry testified that he went to numerous political functions in support of Hillegeist and that he walked door-to-door campaigning for him.  Leach testified that he walked door-to-door campaigning for Hillegeist and that, approximately once per week, he drove a truck with Hillegeist signs on the sides.  Skinner testified that he placed Hillegeist signs in his yard and a Hillegeist bumper

29

sticker on his van. He also testified that, when asked about the election, he would state his opinion that he considered Hillegeist to be the person most qualified for the sheriff position. Evans testified that he walked door-to-door campaigning for Hillegeist, put up Hillegeist signs, and participated in two fundraisers for Hillegeist. Rosas testified that he put up Hillegeist billboards, walked door-to-door campaigning for him, and wore Hillegeist paraphernalia. Brady testified that he made and put up Hillegeist signs, wore Hillegeist shirts, and spoke with people at the county fair in support of Hillegeist. Chamblee testified that he organized a barbecue cook-off in support of Hillegeist at the county fair and that he wore a Hillegeist shirt and cap at this event. He also testified that he polled for Hillegeist on election day.

The County does not claim that the above conduct did not constitute expressive conduct subject to First Amendment protection. However, the County contends that the expressive conduct did not constitute a comment on a matter of public concern because the Plaintiffs supported Hillegeist merely to promote their own job security; they did not support him "based upon political ideology or concerns, or party affiliation." The County contends that this is evidenced by the fact that many of the Plaintiffs had worked at the sheriff's department for a number of years under a number of sheriffs and, during each

30

sheriff's election, these Plaintiffs unfailingly supported the incumbent.

"[T]here can be no question that . . . campaigning for a political candidate . . . relate[s] to a matter of public concern." Vojvodich v. Lopez, 48 F.3d 879, 885 (5th Cir. 1995). The fact that the Plaintiffs may have been motivated to support Hillegeist out of a concern for their job security does not change our conclusion that their public displays of support for Hillegeist related to a matter of public concern. In Kinsey v. Salado Independent School District, 950 F.2d 988 (5th Cir. 1992), this court considered en banc a claim that the school board suspended the plaintiff superintendent because he supported a political slate of incumbent board members who were defeated in the most recent election. See id. at 990. The losing slate supported the plaintiff's continued superintendency, and the winning slate opposed it. See id. In applying the Pickering/Connick balancing test, the plurality concluded that, "[n]otwithstanding [the plaintiff's] interest in retaining his position as superintendent, his speech and association involved matters of great public concern--the performance of elected officials." Id. at 995. Kinsey thus indicates that the fact that the Plaintiffs may have been motivated by self-interest rather than abstract political ideology does not indicate that their expressive activity in support of Hillegeist did not address a matter of public concern. The Supreme Court recently

31

confirmed the correctness of this conclusion in O'Hare when it stated that "one's beliefs and allegiances ought not to be subject to probing or testing by the government." O'Hare, 116 S. Ct. at 2358. We conclude that the Plaintiffs' speech related to a matter of public concern, and we therefore proceed to the determination of whether the Plaintiffs' interests in their expressive activities in support of Hillegeist outweighed the County's interest "in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

We have read Pickering, as expounded in Connick, "to require a comprehensive but flexible analysis--a balance which weighs the particular aspects of the government's interest in effective service and the plaintiff's interest in freedom of speech that arise in each fact situation." McBee, 730 F.2d at 1016. We have read the Supreme Court precedent applying Pickering to indicate that a number of factors are relevant in balancing the interests of the individual against those of the state, including the following: (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as hostile, abusive, or

32

insubordinate; (5) whether the activity impairs discipline by superiors or harmony among coworkers.  See Click v. Copeland, 970 F.2d 106, 112 (5th Cir. 1992); Matherne v. Wilson, 851 F.2d 752, 760 (5th Cir. 1988).[6]  We have also concluded that, in "cases involving public employees who occupy policymaker or confidential positions . . . , the government's interests more easily outweigh the employee's (as a private citizen)."  Kinsey, 950 F.2d at 994; see also Vojvodich, 48 F.3d at 885.  In this case, these factors militate strongly in favor of a conclusion that the Plaintiffs' political interest in political activity in support of Hillegeist outweighed the County's interest in efficiency in the services that it provides through its employees because any negative impact that the Plaintiffs' activity could have had on the efficiency of the sheriff's department was minimal, if their activity could have created any such impact at all.[7]

---

[6]  The above list of factors is nonexclusive.  See Vojvodich, 48 F.3d at 885.  As the Supreme Court observed in Pickering and Connick, "'[b]ecause of the enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged.'"  Connick, 461 U.S. at 154 (ellipses in original) (quoting Pickering, 391 U.S. at 569).

[7]  In this case, the district court submitted to the jury the question of whether the Plaintiffs' interest in politically supporting Hillegeist outweighed the County's interest in efficiently providing the services it performs through its employees.  The ultimate determination mandated by Pickering and Connick of whether a public employee's interest, as a citizen, in commenting on matters of public concern outweighs the government's interest, as an employer, in efficiency in the

33

public services that it performs through its employees constitutes a legal determination.  See Kinsey, 950 F.2d at 992 (describing the Pickering/Connick balance as a threshold legal issue); Fyfe v. Curlee, 902 F.2d 401, 405 (5th Cir. 1990) ("Th[e Connick/Pickering] balancing is to be conducted by the court as a matter of law, not fact.").

To the extent that Pickering/Connick balancing entails a fact-intensive inquiry, it might be appropriately characterized as a mixed question of law and fact--that is, a question entailing the application of a legal standard to a particular set of facts.  See Ornelas v. United States, 116 S. Ct. 1657, 1662 (1996) (describing mixed questions of law and fact as questions as to which the "'historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated'" (alterations in original) (quoting Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19 (1982))).  Our decision in Schneider v. City of Atlanta, 628 F.2d 915 (5th Cir. 1980), lends some support to this conclusion.  In Schneider, we observed that, "[a]lthough the balancing test prescribed in Pickering is a question of law for the court, this circuit has recognized that in striking this balance between the interests of a governmental employee as a citizen and the interests of the government in promoting efficiency of the services it performs through its employees, there are factual matters appropriate for determination by a jury."  Id. at 919 n.4.  The court then cited with approval a Seventh Circuit case that apparently approved of the district court's submission of the Pickering balancing issue to the jury as a mixed question of law and fact.  See id. (citing McGill v. Board of Educ. of Pekin Elementary Sch. Dist., 602 F.2d 774, 777 (7th Cir. 1979) (affirming judgment for the plaintiff teacher where the district court had instructed the jury that the teacher's criticism of school district policy and officials was not constitutionally protected if "the teacher's actions materially and substantially interfere with the operation of the education process in the classroom" because sufficient evidence existed to support the jury's implicit conclusion that the teacher's actions did not cause disruption)).

Schneider, however, was a pre-Connick case.  Connick created some ambiguity as to the scope of our review of a determination at the district court level (either by the court or the jury) of whether a public employee's interest, as a citizen, in commenting on matters of public concern outweighs the government's interest,

34

as an employer, in efficiency in the services it performs through its employees.  In this regard, the Court stated:

> The Constitution has imposed upon this Court final authority to determine the meaning and application of those words of that instrument which require interpretation to resolve judicial issues.  With that responsibility, we are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether or not they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.  . . .  Because of this obligation, we cannot avoid making an independent constitutional judgment on the facts of the case.

Connick, 461 U.S. at 150 n.10 (internal quotation marks, citations, and modifications omitted).  The Court then proceeded to discuss a number of the weight factors mentioned in the text, supra, and, in doing so, arguably paid little if any deference to the district court's conclusions.  For example, the Court stated that it "agree[d] with the District Court that there [was] no demonstration . . . that the [plaintiff's expressive conduct] impeded [her] ability to perform her responsibilities" in the district attorney's office.  Id. at 151.  Additionally, the Court stated that "[t]he District Court was also correct to recognize that it is important to the efficient and successful operation of the District Attorney's office for Assistants to maintain close working relationships with their superiors."  Id. (internal quotation marks omitted).

One commentator has indicated that Connick did not make "altogether clear whether Pickering 'balancing' was a question of mixed law and fact, or entirely one of law" and that the case may indicate that appellate courts are to function as "super trier[s]-of-fact with regard to the extent of actual (or reasonably anticipated) detrimental impacts of given items of employee speech on particular 'working relationships' or specific governmental operations."  See Richard Hiers, Public Employees' Free Speech:  An Endangered Species of First Amendment Rights in Supreme Court and Eleventh Circuit Jurisprudence, 5 U. FLA. J.L. & PUB. POL'Y 169, 281 (1993).  The Eleventh Circuit seems to have adopted this approach, describing jury findings on Pickering balancing to be "only advisory."  Bryson v. City of Waycross, 888 F.2d 1562, 1566 n.2 (11th Cir. 1989); see also Morales v. Stierheim, 848 F.2d 1145 (11th Cir. 1988) (conducting a Pickering balance and apparently giving no deference to the findings

The Plaintiffs' political activities in support of Hillegeist all took place while the Plaintiffs were off-duty. Their activities consisted of positive statements in support of Hillegeist rather than negative statements about Molina;[8] in no sense could their actions be characterized as hostile, abusive, or insubordinate. When asked at trial if he was aware of any negative statements about him made by the Plaintiffs, Molina responded that he was aware of none. In sum, this is a case of "subordinate[s] who . . . expressed a reasoned preference for

_____

regarding the factors relevant to the balance implicit in the jury's conclusion that municipal officials reassigned the plaintiff in violation of his First Amendment rights).

   To date, we have avoided the issue of the extent to which the factors relevant to Pickering/Connick balancing outlined supra constitute factual matters subject to deference on appellate review. See Matherne, 851 F.2d at 761 (avoiding the issue of whether the district court could properly submit any portion of the Pickering/Connick balancing issue to the jury by concluding that, "even when [the court] view[ed] the facts in the light most favorable to the sheriffs in their official capacities, [the plaintiff's] activities were protected under the first amendment, and [the sheriff] was not justified in firing [the plaintiff] for those activities" (footnote omitted)). We likewise need not decide this issue here because, even if we conduct a de novo review of the factual record in evaluating the jury's determination that the Plaintiffs' interest in engaging in political activities in support of Hillegeist outweighed the County's interest in efficiency in the services it provides through employees in the sheriff's department, we conclude that the jury's determination was correct.

   [8]  The only evidence of any negative statements by any of the Plaintiffs regarding Molina to which the County directs our attention is Evans's testimony that, during a private conversation, he stated that he considered Molina to be a liar.

36

another superior;" it is not a case of subordinates who "blackguarded [a superior's] honesty and ability up and down the county." McBee, 730 F.2d at 1017; see also Matherne, 851 F.2d at 761.[9]

Furthermore, assuming that the Plaintiffs' former positions in the sheriff's department could be considered "policymaking" positions,[10] such a conclusion is not dispositive of our balancing inquiry. See Vojvodich, 48 F.3d at 884. As the Supreme Court observed in Branti, "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved." Branti, 445 U.S. at 518; see also Vojvodich, 48 F.3d at 884. Indeed, the Branti court expressly observed that "party affiliation is not necessarily relevant to every

---

[9] At trial, testimony was introduced that John Font, one of the plaintiffs below, made negative comments to fellow officers about Molina. Notably, however, the jury returned a verdict against Font on his First Amendment claim, and he is not a party to this appeal.

[10] Our precedent clearly indicates that, at a minimum, Skinner, who served as a patrol deputy, did not wield policymaking authority. See Click, 970 F.2d at 108 (noting that the deputy positions of civil warrants officer and chief criminal district court bailiff did not involve policymaking); Matherne, 851 F.2d at 761 (holding that sheriff's deputy occupying the lowest rung in the chain of command in the department held a position that "imposed upon him the professional duties of a peace officer, not the politically sensitive requirements of a confidential aide to a politically elected official").

policymaking or confidential position." <u>Branti</u>, 445 U.S. at 518. The record in this case strongly supports a conclusion that the Plaintiffs did not fall within "the exceptional class of public servants of whom political allegiance may be demanded." <u>Garcia v. Reeves County</u>, 32 F.3d 200, 205 (5th Cir. 1994).

At trial, Molina testified as follows regarding the necessity of having individuals who supported him politically in the positions occupied by the Plaintiffs:

> Q:   Now, sir, wouldn't it be fair to say that it is
>      your testimony that whether somebody supported
>      Sheriff Hillegeist or whether they supported you
>      would have nothing to do with the decision as to
>      whether they were retained, demoted, transferred
>      or let go?  Correct?
>
> A:   That is correct.
>
> Q:   In other words, you didn't feel like you needed to
>      have political--your own political supporters in
>      any positions in the sheriff's department,
>      correct?
>
> A:   That is correct.
>
> . . .
>
> Q:   Okay.  Now, would it be fair to say that for the
>      position of lieutenant you did not have to have a
>      person in that position to support you in a
>      sheriff's election campaign?
>
> A:   No one needed to support me.
>
> Q:   Including lieutenants, correct, sir?
>
> A:   That is correct.
>
> Q:   In other words, you ought to be able to work with-
>      -as sheriff of Fort Bend County, you ought to be
>      able to work with a lieutenant who had supported
>      Sheriff Hillegeist, correct?

A:   Yes.

Q:   In fact, you ought to be able to work with, as sheriff of Fort Bend County, somebody who actively supported Sheriff Hillegeist, correct?

A:   Yes, sir.

Q:   So, in going through the decisions that you made, all the personnel decisions that you made--hiring, firing, demotions, et cetera--none of those--in none of those decisions was the political support of Hillegeist or you ever a factor at all?

. . .

A:   It was never a factor.

Not only does this testimony indicate that the Plaintiffs, none of whom occupied a position higher than lieutenant in the sheriff's department chain of command, did not occupy positions for which political affiliation is an appropriate employment criterion, it also indicates that their political activity in support of Hillegeist had little if any potential for undermining close working relationships within the sheriff's department or for impairing discipline by superiors or harmony among coworkers within the department.  We therefore conclude that the Pickering/Connick balance weighs in favor of the Plaintiffs and that Molina therefore was not privileged to decline to rehire them based upon their political support for Hillegeist.

### C.  Jury Charge's Placement of the Burden of Proof

The County contends that the instructions submitted to the jury improperly placed upon it the burden of persuading the jury

that the reasons that it proffered for Molina's failure to rehire the Plaintiffs were not pretextual. The jury instruction provided in relevant part as follows:

> In order to find that R. George Molina intentionally violated Plaintiffs' rights under the First Amendment, you must find by a preponderance of the evidence that such speech and/or association activities were a substantial or motivating factor in his decision not to rehire them. To prove that their speech and/or association activities were a substantial or motivating factor in R. George Molina's decision not to rehire them, the plaintiffs do not have to prove that their speech and/or association activities were the only reason R. George Molina decided not to rehire them. Plaintiffs need only prove that their speech and/or association activities were a substantial consideration that made a difference in or influenced R. George Molina's decision not to rehire them.
>
> . . .
>
> If you find that plaintiffs have established each element of their claims, you must then decide whether the defendant has shown by a preponderance of the evidence that R. George Molina would have elected not to rehire the plaintiffs for other reasons even if plaintiffs had not engaged in their protected speech or association activities. If you find that R. George Molina would have elected not to rehire the plaintiffs for reasons wholly apart from the speech or association activity, then your verdict should be for the defendant.

This jury instruction accurately reflects the holding of the Supreme Court in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977). In that case, the Court held that a plaintiff claiming that a public employer retaliated against him for the exercise of his First Amendment right to free expression bears the burden of proving "that his conduct was constitutionally protected, and that this conduct was a

40

'substantial factor'--or, to put it in other words, that it was a 'motivating factor'" in the defendant public employer's adverse employment action.  Id. at 287 (footnote omitted).  If the plaintiff carries this burden, the defendant public employer may nonetheless avoid liability if the trier of fact concludes that the defendant has "shown by a preponderance of the evidence that it would have reached the same decision [regarding the adverse employment action taken against the plaintiff] even in the absence of the protected conduct."  Id.

The County argues that Mt. Healthy does not dictate the appropriate allocation of the burden of proof in this case because it applies only in "mixed motive" cases--that is, cases in which both legitimate and illegitimate factors motivated the defendant's adverse employment action.  It contends that this is a "pretext" case--that is, a case in which the plaintiff contends that the defendant's adverse employment action was motivated by only illegitimate factors and that the legitimate factors proffered by the defendant as motivating its action are merely pretextual.  "In pretext cases, 'the issue is whether either illegal or legal motives, but not both, were the "true" motives behind the decision.'"  Price Waterhouse v. Hopkins, 490 U.S. 228, 260 (1989) (White, J., concurring) (quoting NLRB v. Transportation Management Corp., 462 U.S. 393, 400 n.5 (1983)).  The County claims that the Supreme Court's decision in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), therefore provides

41

the appropriate allocation of the evidentiary burdens in this case.  The County's argument fails for several reasons.

First, the McDonnell Douglas burden-shifting framework constitutes "the proper order and nature of proof in actions under Title VII of the Civil Rights Act of 1964."  Id. at 793-94; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  The County has cited no authority for the proposition that the McDonnell Douglas burden-shifting framework is applicable to patronage dismissal and free-speech retaliation cases.[11]

Second, the Supreme Court developed the McDonnell Douglas framework as a means of allowing Title VII claimants to prove up claims of unlawful discrimination in the absence of direct evidence of such discrimination.  As such, the Court has indicated that the framework is applicable in the Title VII context only when the plaintiff's proof of discrimination is circumstantial; it "is inapplicable where the plaintiff presents direct evidence of discrimination."  See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985); see also Rizzo v. Children's World Learning Ctrs., Inc., 84 F.3d 758, 762 (5th Cir.

_____

[11]  Our research has revealed one case in which a court of appeals considered the possibility that McDonnell Douglas may provide the appropriate framework for evaluating some patronage dismissal cases.  See McMillian v. Svetanoff, 878 F.2d 186, 190 n.3 (7th Cir. 1989).  However, the court in that case declined to decide the issue based on a conclusion that the plaintiff would fair no better under the McDonnell Douglas framework than under the Mt. Healthy framework.  See id.

42

1996) ("The district court improperly analyzed this case. This is not a circumstantial evidence case, where we apply the McDonnell Douglas burden shifting framework; rather, this is a direct evidence case."); Moore v. USDA, 55 F.3d 991, 995 (5th Cir. 1995) ("In the rare situation in which the evidence establishes that an employer openly discriminates against an individual it is not necessary to apply the mechanical formula of McDonnell Douglas to establish an inference of discrimination." (internal quotation marks omitted)). As indicated in Part III.D, infra, in this case, the Plaintiffs presented direct evidence that their protected political activity motivated Molina not to rehire them. Specifically, they offered testimony from a number of witnesses that Molina admitted to them that he failed to rehire the Plaintiffs because of their political activity. See Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993) ("Direct evidence is evidence which, if believed, proves the fact without inference or presumption."). Thus, assuming that the McDonnell Douglas framework has potential application in patronage dismissal and free-speech retaliation cases, it can have no application here.

Third, the Mt. Healthy framework actually benefits defendants such as the County. Contrary to the County's contention, the Mt. Healthy framework does not improperly shift to the defendant the ultimate burden of persuading the trier of fact that it did not take an adverse action against the plaintiff

43

based at least in part on an improper motive.  See Transportation Management, 462 U.S. at 400 n.5; Price Waterhouse, 490 U.S. at 260 (White, J., concurring).  This point is demonstrated by the language of the jury instruction at issue here.  The second paragraph of the instruction clearly indicates that the County did not need to establish that Molina would not have rehired the Plaintiffs even absent their protected conduct unless the Plaintiffs carried their burden of proving that their political activity in support of Hillegeist was constitutionally protected and that this activity was a substantial or motivating factor in Molina's decision not to rehire them.

In essence, Mt. Healthy may be properly construed as creating an affirmative defense because it allows the defendant to avoid liability once the plaintiff has carried his burden of proving that an improper consideration was a substantial or motivating factor in the defendant's adverse employment action by proving that it would have taken the same adverse action even in the absence of the improper consideration.  See Price Waterhouse, 490 U.S. at 246 (plurality opinion) ("[T]he employer's burden [under the Mt. Healthy framework] is most appropriately deemed an affirmative defense:  the plaintiff must persuade the factfinder on one point, and then the employer, if it wishes to prevail, must persuade it on another."); Mooney v. Aramco Serv. Co., 54 F.3d 1207, 1216 (5th Cir. 1995) ("Although Price Waterhouse[, which held that the Mt. Healthy framework is applicable in

44

certain Title VII cases,] can be characterized as a method to prove discrimination, the mixed-motives theory is probably best viewed as a defense for an employer."). As the district court observed in addressing the County's objection to its jury instruction, the instruction could in no way prejudice the County because it did nothing to diminish the Plaintiffs' burden of proving that their political activity in support of Hillegeist constituted a substantial or motivating factor in Molina's decision not to rehire them. Rather, this portion of the instruction aided the County by creating the possibility that the jury could conclude that the County was not liable even if it was persuaded that the Plaintiffs' political activity in support of Hillegeist was a substantial or motivating factor in Molina's decision not to rehire them.[12] We therefore reject the County's contention that the district court erred in instructing the jury on the evidentiary burdens applicable to the Plaintiffs' First Amendment claim.

### D. Sufficiency of the Evidence Supporting the Jury's Finding on Causation

The County contends that the district court erred in denying its motion for a new trial because the jury's finding that Molina failed to rehire the Plaintiffs based upon their political activity in support of Hillegeist is not supported by sufficient

---

[12] Indeed, the County conceded as much when it declined the district court's offer to remove the entire paragraph from the instruction.

evidence or is against the great weight and preponderance of the evidence. Given our disposition of the County's claim regarding the proper evidentiary framework applicable to the Plaintiffs' First Amendment claim, we construe the instant claim as a contention that the district court should have ordered a new trial because (1) insufficient evidence existed to support the jury's conclusion that the Plaintiffs' political activity was a substantial or motivating factor in Molina's decision not to rehire them and (2) even if sufficient evidence existed to support this conclusion, the jury's further conclusion that Molina would not have made the same decision absent the Plaintiffs' political activity is against the great weight and preponderance of the evidence.

"A trial court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." Dotson v. Clark Equip. Co., 805 F.2d 1225, 1227 (5th Cir. 1986). This court may overturn a denial of a motion for a new trial only upon a finding of an abuse of discretion. Pagan v. Shoney's, Inc., 931 F.2d 334, 337 (5th Cir. 1991). Our review of a district court's decision to deny a motion for new trial is more deferential than our review of the district court's decision to grant such a motion. Pryor v. Trane Co., ___ F.3d ___, NO. 97-40645, 1998 WL 163701, at *1 (5th Cir. Apr. 24, 1998); Pagan, 931 F.2d at 337.

> When the trial judge has refused to disturb a jury
> verdict, all the factors that govern our review of his
> decision favor affirmance. Deference to the trial
> judge, who has had an opportunity to observe the
> witnesses and to consider the evidence in the context
> of a living trial rather than upon a cold record,
> operates in harmony with deference to the jury's
> determination of the weight of the evidence and the
> constitutional allocation to the jury of questions of
> fact.

Shows v. Jamison Bedding, Inc., 671 F.2d 927, 930 (5th Cir. 1982). Accordingly, we will hold that the district court has abused its discretion in denying a motion for new trial on evidentiary grounds only if, viewing the evidence in the light most favorable to the verdict, we conclude that "the evidence points 'so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary [conclusion].'" Pagan, 931 F.2d at 337 (alterations in original) (quoting Jones v. Wal-Mart Stores, Inc., 870 F.2d 982, 987 (5th Cir. 1989)); see also Pryor, ___ F.3d at ___, 1998 WL 163701, at *1.

The record in this case contains more than ample evidentiary support for the jury's conclusion that (1) the Plaintiffs proved by a preponderance of the evidence that their political activity constituted a substantial or motivating factor in Molina's decision not to rehire them and (2) the County failed to prove by a preponderance of the evidence that Molina would have chosen not to rehire the Plaintiffs even absent their political activity. Numerous witnesses testified that Molina made statements to them

47

indicating that he declined to rehire the Plaintiffs based upon their political activity in support of Hillegeist.

Carolyn Faye Dickerson, an employee of the Precinct 2 Justice of the Peace in Fort Bend County, testified that, while Molina occupied that position, she heard him say that "some of the Hillegeist supporters at the first of the year probably would no longer have a job at the sheriff's department." Mary Salais, another employee of Molina while he served as a justice of the peace, testified that during the sheriff's election, Molina expressed anger when certain officers applied for warrants because they were campaigning for Hillegeist. She also testified that Molina told her that Brady "[did]n't know . . . which side [his] bread is buttered on" and that he "must not value his job or appreciate his job very much because he was campaigning for the wrong side." Additionally, Salais testified that during a conversation that she had with Molina after he took office, Molina stated, "We were out to dinner one night and that's when I saw Tony Baloney [Rosas] putting Hillegeist signs in front of my signs and that really pissed me off, kid, and that's when I decided to fire his ass." Elmo Cepeda, a police officer with the Missouri City police department who worked for Fort Bend County's drug task force, testified that Molina told him that he declined to rehire Chamblee because he "was backing the wrong man." Larry Pittman, the officer who took Chamblee's place in the detective bureau, testified that Molina told him that Chamblee "had bet on

the wrong horse and lost." Bettye Newberry, a former employee of Fort Bend County, testified that she had a conversation with Molina at a political rally during the sheriff's campaign and that, during their conversation, they saw Hillegeist with a group of his supporters, including Brady and Fortenberry. She testified that Molina said that Hillegeist's supporters were "going to be surprised if they don't have their jobs."

Additionally, the Plaintiffs offered a substantial amount of evidence indicating the high quality of their job performance. Brady received a rating of outstanding, the highest possible rating, on his last employment evaluation with the sheriff's department. Brady also testified that a few days before Molina officially announced that he intended to run for sheriff, he telephoned Brady and stated that he considered Brady to be one of the "good people" in the sheriff's department. Fortenberry also received a rating of outstanding in his last employment evaluation in the sheriff's department. Skinner testified that he had been named Officer of the Year in 1992, the same year that Molina chose not to rehire him, and that he had received this award once before. Leach received an overall rating of very good in his last employment evaluation. Ken Lee, a captain in the sheriff's department during Molina's tenure as sheriff, testified that he considered Leach to be a good employee and a hard worker. Rosas received an overall rating of very good in his last employment evaluation, and his supervisor described him as having

49

"done an excellent job of organizing the Warrants Section and implementing new procedures." Evans received a rating of very good on his last employment evaluation in the sheriff's department and consistently received evaluation ratings of very good or outstanding. Chamblee was part of the Fort Bend County Narcotics Task Force, which consisted of employees of numerous local agencies who worked in conjunction with federal agencies to ferret out drug trafficking in the area. Elizabeth Wiggington, a special agent for the Internal Revenue Service, testified that Chamblee's reputation in the federal agencies with which he worked on the Narcotics Task Force was "very good" and that he had been asked to teach at several law enforcement schools. Jack Schumacher, a special agent for the Drug Enforcement Administration, testified that Chamblee received an award from the International Narcotics Officers Association based upon his job performance.

The evidence outlined above provides a strong basis for the jury's conclusion that the Plaintiffs' political activity in support of Hillegeist constituted a substantial or motivating factor in Molina's decision not to rehire him. The County nonetheless contends that the record in this case demonstrates overwhelmingly that Molina did not base his decision not to rehire the Plaintiffs on their political activity in support of Hillegeist. In support of this contention, the County points almost exclusively to various pieces of Molina's testimony.

50

Specifically, the County points to Molina's testimony that political affiliation and campaign activities played no part in his decision not to rehire the Plaintiffs and that he was unaware of the political activities of some of the Plaintiffs. The County also notes that Molina testified that, in choosing not to rehire the Plaintiffs, he based his decision largely on negative statements made about each of the Plaintiffs' job performance during the transition team meetings. Additionally, the County relies on Molina's testimony that he chose not to rehire some of the Plaintiffs because he did not know them very well.

As the trier of fact, the jury had the exclusive authority to assess the credibility of witnesses, including Molina. It was therefore free to discredit Molina's testimony regarding his motivation for failing to rehire the Plaintiffs. See Hiltgen v. Sumrall, 47 F.3d 695, 700 (5th Cir. 1995) ("'Even though we might have reached a different conclusion if we had been the trier of fact, we are not free to reweigh the evidence or to re-evaluate credibility of witnesses.'" (quoting Rideau v. Parkem Indus. Servs., Inc., 917 F.2d 892, 897 (5th Cir. 1990)).

The County also argues that the fact that Molina rehired numerous Hillegeist supporters indicates that the Plaintiffs' support of Hillegeist did not motivate Molina's decision not to rehire them. While this constitutes probative evidence that Molina may not have chosen not to rehire the Plaintiffs because of their political affiliation, it certainly did not compel such

51

a conclusion by the jury, particularly in light of testimony outlined above that Molina made statements indicating that he intended to make employment decisions based upon political support.  Moreover, Molina testified that it simply would not have been feasible not to rehire all of the Hillegeist supporters working in the sheriff's department when he took office.

In sum, the evidence in this case does not point so strongly and overwhelmingly in favor of a conclusion that (1) the Plaintiffs' political activity was not a substantial or motivating factor in Molina's decision not to rehire them or (2) that Molina would have chosen not to rehire the Plaintiffs absent their support for Hillegeist that a reasonable jury could not reach a contrary conclusion.  We therefore conclude that the district court did not abuse its discretion in denying the County's motion for a new trial.[13]

---

[13]    The County contends that it is entitled to judgment as a matter of law on Skinner's First Amendment claim because he alleged that Molina refused to rehire him based upon the political activity of his wife, Cheryl Skinner, in support of Hillegeist rather than his own political activity.  The County therefore argues that Skinner is impermissibly "assert[ing] a claim on the basis of another person's constitutionally protected rights."  We disagree.

As noted supra, Skinner engaged in political activity in support of Hillegeist himself, and he alleged that this activity also motivated Molina's decision not to rehire him.  Furthermore, the First Amendment guarantees a right to free association for the purpose of engaging in expressive activity.  See Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984).  To the extent that we have concluded that Molina could not constitutionally predicate his decision not to rehire Skinner on the basis of Skinner's own support for Hillegeist, we likewise

52

### E.   Admission of Testimony from Barbara Smith

The County next contends that the district court erred in admitting testimony from Barbara Smith, a former secretary of Frank Briscoe, an assistant district attorney in Fort Bend County.  Smith testified that, on July 21, 1992, she answered a telephone call to Briscoe from Molina during which Molina asked for Briscoe's endorsement in his bid for sheriff.  Smith stated that when she informed Molina that Briscoe did not intend to endorse either candidate in the sheriff's race, Molina responded "there was going to be trouble."  Smith further testified that Briscoe was fired from the district attorney's office the following day.

The County contends that the prejudicial effect of this testimony substantially outweighed its probative value and that it was therefore inadmissible under Rule 403 of the Federal Rules of Evidence.  In support of this contention, the County observes that, on cross-examination, Smith conceded that she did not know why Briscoe was terminated and that she was unaware of any relationship between Molina and Jack Stern, Fort Bend County's

conclude that Molina could not predicate his decision on the fact that Skinner chose to associate (here through marriage) with a Hillegeist supporter.  See Martinez v. Cotulla Indep. Sch. Dist., 700 F. Supp. 17, 19 (S.D. Tex. 1988) (holding that a genuine issue of material fact existed as to whether the plaintiff's support of her husband's political activities was a substantial or motivating factor in the school district's decision to terminate her and therefore that a genuine issue of material fact existed as to whether the plaintiff's termination violated her First Amendment rights), aff'd, 922 F.2d 839 (5th Cir. 1990).

district attorney. It therefore argues that Smith's testimony was unduly prejudicial because "Briscoe could have been fired for any number of reasons unrelated to Molina" and "there is no evidence to support the supposition that anyone other than Jack Stern . . . was responsible for Briscoe's termination."

We review a district court's evidentiary rulings only for an abuse of discretion. Smith v. Isuzu Motors Ltd., 137 F.3d 859, 861 (5th Cir. 1998). In determining whether evidence is properly excludable under Rule 403, district courts must be cognizant of the fact that, because Rule 403 operates to exclude relevant evidence, application of the rule "'must be cautious and sparing.'" United States v. Pace, 10 F.3d 1106, 1116 (5th Cir. 1993) (quoting United States v. McRae, 593 F.2d 700, 707 (5th Cir. 1979)). We conclude that the district court did not abuse its discretion in admitting Smith's testimony regarding Molina's telephone call to Briscoe's office.

Smith's testimony was relevant in that Molina's statement that "there was going to be trouble" because of Briscoe's refusal to endorse him constituted evidence of Molina's retaliatory intent. Molina's statement to Smith strongly implies that he intended to attempt to make trouble for Briscoe because of Briscoe's refusal to endorse him regardless of whether Molina was actually capable of making trouble for Briscoe. Even assuming that the tendency of Smith's testimony on direct examination to imply that Molina was responsible for Briscoe's discharge

54

rendered this testimony unfairly prejudicial, the County effectively mitigated any unfair prejudice by establishing on cross-examination that Smith was unaware of any relationship between Molina and Stern and that she had no idea why Briscoe was fired. We therefore conclude that the district court did not abuse its discretion in admitting Smith's testimony.

### F. Whether the District Court's Award of Attorney's Fees Constituted an Abuse of Discretion

The County contends that the district court erred in awarding the attorneys who represented the Plaintiffs a total of $751,370.75 in attorney's fees in connection with this lawsuit pursuant to 42 U.S.C. § 1988. In this regard, the County contends that the Plaintiffs' request for fees contained vague, conglomerated, and duplicative billing entries. The County also contends that the district court erred in allowing the Plaintiffs to recover fees in connection with Molina's interlocutory appeal because the Plaintiffs voluntarily dismissed Molina prior to resolution of that appeal by this court en banc.[14]

We review a district court's award of attorney's fees for an abuse of discretion, see Riley v. City of Jackson, 99 F.3d 757, 759 (5th Cir. 1996), and we accept the factual findings upon

---

[14] The County does not contend that the attorney's fee award ($751,370.75) was disproportionate to the amount of damages recovered by the Plaintiffs ($401,109.43, including the jury's awards of mental anguish damages, which we reinstate infra). See Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1048 (5th Cir. 1998).

which the district court bases its award of attorney's fees, including the determination of the number of hours reasonably expended on the litigation, unless they are clearly erroneous, see Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 324 (5th Cir. 1995).  We conclude that the district court's award of attorney's fees in this case does not constitute an abuse of discretion.

With respect to the specificity with which a party seeking attorney's fees must itemize the services for which it seeks recovery, the Supreme Court has stated that "counsel, of course, is not required to record in great detail how each minute of his time was expended.  But at least counsel should identify the general subject matter of his time expenditures."  Hensley v. Eckerhart, 461 U.S. 424, 437 n.12 (1983).  The Plaintiffs' bill of costs contains daily entries of time expended on the case that adequately describe the activity upon which the time was expended.  Moreover, the record in this case reflects that the district court personally conducted an exhaustive line-by-line analysis of the bill of costs submitted by the Plaintiffs in support of their request for attorney's fees and that the court ordered the Plaintiffs' counsel to submit two amended bills of costs providing more detailed itemizations of certain categories of expenses for which they sought reimbursement.  The district court also entered a detailed order explaining its reasons for denying certain categories of costs as unnecessary or

56

duplicative. "[G]iven the district court's familiarity with this case, including the quality of the attorneys' work over a period of several years, we cannot say that the district court clearly erred in refusing to [further] reduce the hours in question for vagueness" or in concluding that the fees that it awarded did not include recovery for duplicative charges. Kellstrom, 50 F.3d at 327; see also Watkins v. Fordice, 7 F.3d 453, 457 (5th Cir. 1993) ("Due to the district court's superior knowledge of the facts . . . , the district court has broad discretion in setting the appropriate award of attorneys' fees.").

Furthermore, the County's claim that the district court abused its discretion in allowing the Plaintiffs to recover attorney's fees incurred during Molina's interlocutory appeal also lacks merit. In Cobb v. Miller, 818 F.2d 1227 (1987), we adopted the Seventh Circuit's reasoning in Mary Beth G. v. City of Chicago, 723 F.2d 1263 (7th Cir. 1983), where that court held that

> "all time spent in pursuit of relief for the same illegal conduct should be considered in awarding attorney's fees once the relief sought is obtained, regardless whether the plaintiff has succeeded in obtaining the relief from only some and not all of the defendants named in connection with the conduct."

Cobb, 818 F.2d at 1233 (quoting Mary Beth G., 723 F.2d at 1281). We went on to state that, "so long as the defendants from whom the plaintiff did not obtain relief were not named frivolously, the total time expended on the claim should be counted" in

57

computing an attorney's fee award.  Id.; see also Kellstrom, 50

F.3d at 327 ("A prevailing litigant may not recover for hours

devoted solely to claims against other parties.  But when claims

against multiple parties share a common core of facts or related

legal theories, a fee applicant may claim all hours reasonably

necessary to litigate those issues."  (citations and internal

quotation marks omitted)).

With the exception of their claim for punitive damages,[15]

the Plaintiffs asserted the same claims against Molina that they

asserted against the County.  To the extent that the County's

liability in this case is based entirely upon Molina's actions,

the Plaintiffs' claims against the County rest on a factual basis

identical to the one on which their claims against Molina rested.

Given that a panel of this circuit unanimously concluded that

Molina was not entitled to qualified immunity from liability for

the Plaintiffs' claims, see Brady, 58 F.3d at 176, it can hardly

---

[15]  The County also contends that the Plaintiffs should not
have been allowed to recover for discovery expenses incurred in
pursuit of their exemplary damages claim because they asserted
this claim only against Molina in his individual capacity.
However, the Plaintiffs' claim that the bill of costs upon which
the district court based its award of attorney's fees includes no
costs for discovery relating solely to the Plaintiffs' claim of
exemplary damages against Molina in his individual capacity, and
the County does not dispute this contention.  In our review of
the record, we have found no indication that the Plaintiffs
sought, or that the district court authorized, recovery of fees
incurred in conducting discovery relevant only to the Plaintiffs'
claim for exemplary damages.

be said that the Plaintiffs' joinder of Molina in his individual capacity as a party defendant was frivolous.

We find the County's contention that the Plaintiffs should not be able to recover attorney's fees for the interlocutory appeal because they dismissed Molina voluntarily prior to our consideration of the appeal en banc unpersuasive. As noted above, the time spent by the Plaintiffs' counsel on the interlocutory appeal constitutes time spent seeking recovery for the same illegal conduct for which the jury found the County liable. Our precedent therefore indicates that the district court could have properly allowed the Plaintiffs to recover for the fees incurred during the interlocutory appeal even if this court had concluded en banc that Molina was entitled to qualified immunity, thereby precluding recovery against him in his individual capacity. See Kellstrom, 50 F.3d at 327; Cobb, 818 F.2d at 1227. Given that the Plaintiffs could have recovered these fees even if they had lost the interlocutory appeal, we see no reason why they should be precluded from such recovery merely because they dismissed Molina voluntarily.[16] We therefore conclude that the district court did not abuse its discretion in allowing the Plaintiffs to recover attorney's fees for fees incurred during the interlocutory appeal.

_____

[16] It is worth noting that, in dismissing Molina voluntarily, the Plaintiffs actually decreased the legal fees that they incurred at the interlocutory appeal phase and thus reduced the amount recoverable against the County.

59

**G.   Plaintiffs' Entitlement to Damages for Mental Anguish**

Brady, Chamblee, Evans, Fortenberry, Leach, and Rosas contend that the district court erred in concluding that they were not legally entitled to mental anguish damages.  We conclude that the district court correctly granted judgment as a matter of law on this issue.

The Supreme Court has long required that compensatory damages for emotional distress "be supported by competent evidence concerning the injury."  Carey v. Piphus, 435 U.S. 247, 264 n.20 (1978).  Failure to establish "actual injury" with sufficient evidence will result in the award of only nominal damages.  Id. at 266-67.  In Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927 (5th Cir. 1996), this court set out to clarify the level of specificity required under Carey.

In Patterson, we addressed two separate issues regarding the proof necessary to support mental anguish damages.  First, we articulated the level of specificity needed to prove a claim for mental damages under Carey.  We held that there must be a "specific discernable injury to the claimant's emotional state," Patterson, 90 F.3d at 940, proven with evidence regarding the "nature and extent" of the harm, id. at 938.  We acknowledged that "hurt feelings, anger and frustration are part of life," and were not the types of harm that could support a mental anguish award.  Id. at 940.  And our language describing the specificity

standard was unequivocal; that standard must be met before mental anguish damages can be awarded.  See id. at 938 (holding that plaintiff "must" present such evidence).

Second, we addressed the types of evidence that may be used to clear that hurdle.  We observed that in proving mental damages "a claimant's testimony alone may not be sufficient to support anything more than a nominal damage award."  Id. at 938 (emphasis added).  We noted that Carey requires evidence that "may include corroborating testimony or medical or psychological evidence." Id. at 940 (emphasis added).  Likewise, we turned to the Equal Employment Opportunity Commission's (EEOC) official guideline statement for guidance.  EEOC POLICY GUIDANCE NO. 915.002 § II(A)(2) (July 14, 1992).  That document provides:

> Emotional harm will not be presumed simply because the complaining party is a victim of discrimination.  The existence, nature, and severity of emotional harm must be proved.  Emotional harm may manifest itself, for example, as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown.  Physical manifestations of emotional harm may consist of ulcers, gastrointestinal disorders, hair loss, or headaches . . . .  The Commission will typically require medical evidence of emotional harm to seek damages for such harm in conciliation negotiations.

Id. at 10-12 (footnotes omitted) (emphasis added).

About two months after our decision in Patterson, the Fourth Circuit issued its decision in Price v. City of Charlotte, 93 F.3d 1241 (4th Cir. 1996), which is a magnum opus on the evidence needed to support compensatory damages for emotional distress.

61

Just as we did in Patterson, the Fourth Circuit used the Supreme Court decision in Carey as a beacon for its analysis. See id. at 1250. The Price court then conducted a comprehensive survey of circuit case law addressing the circumstances in which a plaintiff's own testimony was found sufficient, and the circumstances in which that testimony was found insufficient. See id. at 1251. In arriving at its determination that the testimony in Price was insufficient, the Fourth Circuit concluded:

> Neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages. In marshaling the evidence necessary to establish emotional distress resulting from a constitutional violation, Carey instructs us that "genuine injury" is necessary.

Id. at 1254 (citing Carey, 435 U.S. at 264).

In this case, the Plaintiffs' own testimony is the sole source of evidence on mental damages. Brady testified that Molina's refusal to rehire him resulted in marital and family problems. Brady also claimed that he had "spent more time on the couch in last three years" because he "didn't feel like the same person." Brady's testimony on mental anguish is less than two pages of trial transcript.

Chamblee testified that Molina's failure to rehire him caused him sleeplessness, loss of appetite, and weight loss. He claimed that he "just couldn't accept it mentally," and that he worried over finding another job at age fifty-three. Chamblee's

62

testimony on mental anguish is roughly eleven lines of trial transcript.

Evans testified that his job loss had produced nervousness, sleeplessness, and anxiety.  He stated that he had been forced to forego insurance coverage due to his unemployment.  He asserted that upon learning of Molina's decision not to rehire him "[he] didn't feel like [he] could perform [his] duties for the remainder of time at the sheriff's department."  Evans' testimony on mental anguish is roughly nineteen lines of trial transcript.

Fortenberry testified that the loss of his job had made him "highly upset," prompting him to see a family physician.  He asserted that he became concerned that his wife would have to quit college and return to work.  He maintained that he had experienced nervousness, sleeplessness, and stress. Fortenberry's testimony on mental anguish is roughly one page of trial transcript.

Leach testified that Molina's failure to rehire him caused nervousness and sleeplessness.  He claimed that he had been forced to leave his home in Fort Bend County to find new employment.  He described that travail as not "fun."  Leach's testimony on mental anguish is roughly nine lines of trial transcript.

Finally, Rosas testified that he gained roughly 100 pounds during the nine months of unemployment that resulted from Molina's failure to rehire him.  He claimed that, like Chamblee,

he worried over job prospects due to his age.  He described the experience as "the worst thing that ever happened to [him]."  He stated that he was "shocked and devastated."  Rosas' testimony on mental anguish is roughly two and a half pages of trial transcript.

The Plaintiffs' testimony in this case is too vague and conclusory to support mental anguish damages.  References to spending too much time on the couch (Brady), not "accept[ing] it mentally" (Chamblee), being "highly upset" (Fortenberry), and experiencing "the worst thing that has ever happened to me" (Rosas), hardly qualify as evidence of demonstrable emotional distress, as required by Carey.  Moreover, when the Plaintiffs do refer to specific manifestations of emotional harm--like nervousness, sleeplessness, or stress--they fail to elaborate with any detail.  Statements like "[my termination] caused marital problems" (Brady), or "there were sleepless nights" (Chamblee), go completely unexplained with no hint as to the nature or extent or severity of the alleged harm.  Conclusory statements give the finder of fact no adequate basis from which to gauge the "nature and circumstances of the wrong and its effect on the plaintiff."  Carey, 435 U.S. at 263-64.  That failure of proof is unacceptable.  As aptly stated by the Fourth Circuit, a plaintiff must present evidence of "demonstrable emotional distress, which must be sufficiently articulated; []conclusory statements that the plaintiff suffered emotional

64

distress . . . [do not] support an award of compensatory damages." Price, 93 F.3d at 1254.

Remarkably, in this case not one plaintiff presented medical or psychological expert testimony as to the emotional harm that was purportedly suffered. Similarly, not one plaintiff presented corroborating testimony from a spouse, family member, friend, or coworker, regarding objective evidence of emotional distress, such as crying spells, outbursts of anger, sleeplessness, or excessive sleeping. Not one of these plaintiffs presented any testimony as to the need for or use of prescription or over-the-counter medication to treat their mental upsets. As such, the evidence of mental damages in this case consists solely of the Plaintiffs' own uncorroborated testimony. Given that "emotional distress [is] fraught with vagueness and speculation, [and] is easily susceptible to fictitious and trivial claims," id. at 1250, we must "scrupulously analyze an award of compensatory damages for a claim of emotional distress predicated exclusively on the plaintiff's testimony," id. at 1251.

The Plaintiffs' testimony is further weakened by the method in which it was elicited. In several instances, the Plaintiffs' testimony consists of simple one-word, yes-or-no answers to leading questions. To a large extent, it was the Plaintiffs' attorneys, and not the Plaintiffs themselves, who testified on the mental damages issue. Evans' testimony on direct examination accurately portrays many of the shortcomings we have discussed:

```
Q:  Did you have sleeplessness?
A:  Yes, I did.
Q:  Did you have nervousness?
A:  Yes.
Q:  Did you have anxiety?
A:  Pardon?
Q:  Did you have anxiety?
A:  Yes.
```

In sum, the Plaintiffs' testimony in this case is vague, conclusory, and uncorroborated. Under Carey, Patterson, and Price, it cannot legally support mental anguish damages.

In reaching our conclusion, we do not now hold, nor have we ever held, that a plaintiff may never prove mental anguish damages with his own testimony alone. In certain cases a plaintiff's testimony alone may be sufficient proof of mental damages. See Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1047 (5th Cir. 1998) ("Patterson recognizes that mental anguish damages . . . [do] not always require that the plaintiff offer medical evidence or corroborating testimony in addition to her own testimony."). Patterson does not conflict with that proposition.

Under Patterson it does not matter what type of evidence is used to satisfy Carey's specificity requirement, so long as that standard is successfully met. When a plaintiff's testimony is particularized and extensive, such that it speaks to the nature, extent, and duration of the claimed emotional harm in a manner that portrays a specific and discernable injury, then that testimony alone may be sufficient.

We recognize that this court has occasionally permitted a plaintiff's uncorroborated testimony to support an award for mental anguish damages. <u>Migis</u>, 135 F.3d 1041; <u>Forsyth v. City of Dallas</u>, 91 F.3d 769 (5th Cir. 1996). Both of those cases, however, were decided after <u>Patterson</u> and offer slim guidance when attempting to compare the sufficiency of the testimony in those cases with that in our case, which consists chiefly of one-word responses to leading questions.

We affirm the district court's decision to grant judgment as a matter of law in favor of the County on the mental anguish awards.[17]

---

[17] The result reached in Part III.G reflects the view of Judges Garza and DeMoss. Judge King, however, would hold that Brady, Chamblee, Evans, Fortenberry, Leach, and Rosas are entitled to reinstatement of the jury's award of mental anguish damages to them. While the evidence that these plaintiffs presented supporting their entitlement to mental anguish damages is, in many respects, not especially compelling, Judge King would hold that our opinion in <u>Forsyth</u>, the benefit of which the district court did not have when it decided to set aside the jury's award of mental anguish damages, compels a conclusion that the jury's award of damages for mental anguish to these plaintiffs was supported by sufficient evidence. The <u>Forsyth</u> panel held that a § 1983 claimant's uncorroborated testimony "that he suffered depression, sleeplessness, and marital problems" constituted sufficient evidence to sustain the jury's award of $75,000 in damages for mental anguish. <u>Forsyth</u>, 91 F.3d at 774.

Furthermore, Judge King would hold that the prior panel opinion in <u>Patterson</u> does not foreclose the result reached in <u>Forsyth</u> because <u>Patterson</u> held only that some evidence of actual manifestation of mental anguish is necessary to sustain a more-than-nominal mental anguish damages award. <u>See</u> <u>Patterson</u>, 90 F.3d at 940. The types of manifestations of mental anguish that <u>Patterson</u> indicates will support an award of mental anguish damages include the same manifestations about which the

67

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

plaintiffs in <u>Forsyth</u> and this case testified: depression, sleeplessness, marital problems, stress, and anxiety. <u>See</u> <u>id.</u> at 939. Judge King would hold that the testimony on mental anguish in this case is materially indistinguishable from the testimony at issue in <u>Forsyth</u> as it is described in that opinion, and the damages awards in this case are much smaller. Judge King would therefore hold that <u>Forsyth</u> requires reinstatement of the jury's award of mental anguish damages to Brady, Chamblee, Evans, Fortenberry, Leach, and Rosas.