IN THE UNITED STATES COURT OF APPEALS
For the Fifth Circuit

_____

No. 98-60784

_____

AHMAD A. VADIE, Doctor,

Plaintiff-Appellee-Cross-Appellant,

VERSUS

MISSISSIPPI STATE UNIVERSITY; ET AL,

Defendants,

MISSISSIPPI STATE UNIVERSITY,

Defendant-Appellant-Cross-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Mississippi
_____

July 5, 2000

Before JOLLY and DeMOSS, Circuit Judges, and DOWD,[*] District Judge.

DOWD, District Judge:

Mississippi State University ("MSU") appeals from the final
judgment entered against it on October 1, 1998, following a jury
verdict in favor of Ahmad A. Vadie ("Dr. Vadie") in this Title VII
case alleging intentional discrimination and retaliation, and from
the district court's December 3, 1998, denial of a motion for

_____

[*] District Judge of the Northern District of Ohio, sitting
by designation.

judgment as a matter of law or, in the alternative, for a new trial.[1] Dr. Vadie appeals the district court's order of December 10, 1998, denying him reinstatement.[2]

I

Dr. Vadie was born in Iran but obtained a masters degree in chemical engineering and a doctorate in petroleum engineering from the University of Texas.[3] In 1982, he accepted a position at MSU and eventually became a tenured full professor in the Department of Petroleum Engineering.[4]

In 1993, MSU's Board decided to close the Department of Petroleum Engineering effective in 1995. MSU had a policy which permitted displaced faculty members to be considered for open faculty positions in other departments. Department heads were

---

[1] MSU also appeals from an October 27, 1998, Order staying the issue of attorney's fees pending resolution of this appeal. We see no need to address this matter.

[2] References to volumes and pages in the record shall take the form, e.g., "R5: 132" meaning Volume 5, page 132; references to exhibits shall take two forms, depending upon whether the exhibit was offered by the plaintiff ("P-#") or by the defendant ("D-#").

[3] Although he had received his degree in petroleum engineering, Dr. Vadie had all the course work necessary for a doctorate in chemical engineering and his dissertation had been on a chemical engineering topic.

[4] Following his education, Dr. Vadie had first returned to Iran to start his own business. He stayed there until 1979 when the political climate forced him to flee to the United States. He subsequently became an American citizen.

responsible for making final recommendations to the Dean, typically based on faculty input.[5]

In April 1993, due to the announced retirement of three professors, that number of faculty positions opened up in the Department of Chemical Engineering.[6] Dr. Vadie applied and, in a letter to the department head, Dr. Donald Hill, dated May 3, 1993, the chemical engineering faculty recommended Dr. Vadie for selection, along with Drs. Rogers and Sparrow.[7] Dr. Hill testified that he was surprised by the letter because prior to its receipt he had not detected support for Dr. Vadie. He sought out each faculty member and asked if the letter was "a mandate to hire Dr. Vadie." He testified that "the answer was a resounding no." R5:176. Later, at a faculty meeting to discuss the recommendations, no one

---

[5] Dr. Clifford George, a chemical engineering faculty member who had served on the screening committee for the 1993 positions at issue here, testified that he understood the role of the faculty as simply identifying which applicants, if any, had the minimum qualifications for a given job.

[6] Advertisements for the positions indicated that they were tenure-track positions, requiring undergraduate/graduate teaching and research experience along with a "Ph.D. in Chemical Engineering or related areas." Rank and salary were to be commensurate with qualifications. P-25. Dr. Hill testified that there are several faculty ranks for tenure-track positions, beginning with the lowest rank of assistant professor to the highest rank of full professor.

[7] Dr. Rebecca Toghiani, a faculty member who had signed the May 3rd letter, testified that the letter was intended to identify which of the five internal candidates, if any, had the minimum qualifications. Dr. George independently confirmed this and noted that it was merely coincidence that there were three job openings and three internal applicants found minimally qualified.

3

spoke up on Dr. Vadie's behalf.[8]  Believing that he did not

actually have full faculty support for Dr. Vadie, Dr. Hill

thereafter recommended only Rogers and Sparrow to the Dean of the

College of Engineering and to the Vice President of Academic

Affairs.  Both Rogers and Sparrow were given positions.  On May 20,

1993, Dr. Vadie was notified by letter from Dr. Hill that he had

not been chosen but that, pursuant to MSU policy, his application

would be held for further consideration.[9]

Dr. Rebecca Toghiani, a member of the chemical engineering

faculty,[10] testified that after the first two hiring decisions had

been made, it came to the attention of the faculty "that [its]

recommendation had been questioned."  R6:234.  The faculty (except

---

[8]     Dr. Hill testified that there was generally strong
support for Dr. Rogers because he had been head of the Petroleum
Engineering Department for eight years and could make strong
contributions to the administration area in the Chemical
Engineering Department.  Dr. Sparrow's candidacy, on the other
hand, was spear-headed by his close friend, Dr. Lightsey.  In
addition, Dr. Sparrow had a lot of contact with undergraduate
students and had a degree that would permit him to teach most of
the undergraduate courses in the department.  Dr. George
independently confirmed that this was the nature and content of the
faculty discussion.

[9]     Dr. Hill testified that during the first phase of the
selection process they were required to consider (and select or
reject) every internal applicant from the two departments that were
closing before they were permitted to seek outside applicants.  Dr.
Vadie was rejected on this first, purely internal, round but
remained eligible for consideration along with the external
applicants.  Dr. George, who served on the faculty committee which
helped screen the candidates, confirmed that this was the
procedure.

[10]    Dr. Toghiani and her husband (who is Iranian) had both
been hired by MSU in 1989.

4

for Dr. Hill) then wrote a letter to Robert Altenkirch, Dean of the College of Engineering. The letter, dated September 20, 1993, indicated the faculty's "unanimous agreement that they followed the guidelines outlined in the relocation procedure, that they are satisfied that they had maximum input into the process, and accept the decision of the administration to hire or not hire the internal faculty recommended as possible candidates in the letter of May 3, 1993 to Dr. Hill." R6:241-242;D-29.[11]

On April 22, 1994, the faculty of the Chemical Engineering Department, including Dr. Hill, again wrote to Dean Altenkirch expressing concern that it was not being appropriately heard with respect to whether or not Dr. Vadie should join that faculty. The faculty emphasized its desire for highly qualified colleagues and that, because of friendships and their need to remain anonymous and bypass personal embarrassment, it had been their intent that the final recommendations for the position openings be made by Dr. Hill. The faculty stated clearly that it did not want Dr. Vadie in the chemical engineering program and that his presence would be "highly counterproductive." It further clarified that "being minimally qualified is not tantamount to being minimally acceptable." D-21.

Ultimately, Dr. Vadie was not selected for any of the three positions that had become vacant in April 1993. In fact, in June

---

[11] Dr. Toghiani admitted, however, that the faculty had never officially rescinded its May 3rd recommendation.

5

1994, the final position was filled by Dr. Nancy Losure, an external applicant, who was hired as an assistant professor.[12]  It is not disputed that Dr. Vadie's qualifications were superior to those of Dr. Losure.[13]

Dr. Vadie appealed to MSU's Board which, on November 17, 1994, sent him a letter reporting that it had unanimously voted to support the University's decision.  The letter stated that "the matter is now final."  P-10.  The November 1994 newsletter of MSU's chapter of the American Association of University Professors, THE ADVOCATE, reported  the non-selection and indicated that Dr. Vadie had told THE ADVOCATE "that he will now seek a remedy in the courts." P-19.

On January 24, 1995, Dr. Vadie filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that MSU had not selected him for any of the vacant positions because of his race and/or national origin.  He filed this lawsuit in June 1995, having received his right-to-sue letter.

By letter dated April 24, 1995, Dr. Vadie was offered a position as Senior Research Engineer in the Water Resources

---

[12]  The job had first been offered to Dr. Michael Harris, an African-American who had graduated from MSU; but he had already accepted another job elsewhere.

[13]  Losure, an American, had just gotten her Ph.D., had little or no teaching experience and no research background.  Even she testified that she was no comparison to Dr. Vadie based on her qualifications.

6

Research Institute at MSU, effective May 16, 1995. This was a funded research position which was full-time but non-tenured.[14]

In August of 1995, a Chemical Engineering Department faculty member died. This faculty member had possessed a doctorate in chemical engineering. According to MSU, the loss of the decedent's expertise in the department necessitated hiring someone who also had a doctorate in chemical engineering.[15] Although not possessing the requisite degree, Dr. Vadie sought the position.[16] He is of the view that, in order to purposefully disqualify him, the qualifications for this position were changed from requiring merely a degree in "a related area" to requiring a Ph.D. in chemical engineering.[17] The faculty screening committee did not recommend

---

[14] Due to this position, Dr. Vadie did not assert a claim for lost income.

[15] Dr. Hill testified that since persons without doctorates in chemical engineering had been considered and hired for the 1993 vacancies, several faculty members felt that there were not enough people to teach the basic subjects, that is, not enough "full-fledged chemical engineers." R5:142. Therefore, when they conducted their search for the 1995 position "there was renewed emphasis on getting a hard core or at least a Ph.D. in chemical engineering." *Id*. Dr. Hill admitted, however, that Dr. Vadie's application was probably the only application on file that was eliminated by adding the requirement of a Ph.D. in chemical engineering. Dr. George confirmed that the faculty was concerned that the person hired should be "real strong in chemical engineering, because [the decedent] was that person to us." R7:396-97.

[16] Dr. Vadie's application materials remained on file from his 1993 application. R5:136, 143-44.

[17] For the three openings in 1993, applicants were required to have a Ph.D. in chemical engineering <u>or</u> a related field (such as
(continued...)

7

Dr. Vadie for the position and it was ultimately filled by Dr. Mark Zappi, an Hispanic, who was hired as an associate professor.

On November 27, 1995, Dr. Vadie filed his second EEOC complaint charging that MSU had not selected him for the 1995 vacancy either because of his national origin or in retaliation for his having filed the first EEOC charge and this lawsuit.[18]

The case was tried to a jury which returned verdicts in Dr. Vadie's favor, finding that MSU did not hire him in the Chemical Engineering Department because of his race or national origin and because of retaliation.[19] The jury awarded $350,000 in compensatory damages "for emotional pain, suffering, inconvenience, or mental anguish." R4:799. Because of the statutory caps on compensatory damages, 42 U.S.C. § 1981a(a)(1) & (b)(3)(D), the district judge subsequently reduced this award to $300,000.[20]

MSU filed a post-judgment motion for judgment as a matter of law and/or for a new trial. This motion was denied. Dr. Vadie

---

[17](...continued)
petroleum engineering -- Dr. Vadie's degree).

[18] This second charge, unlike the charge relating to the 1993 positions, did not indicate race as a basis for the alleged discrimination.

[19] Although there were actually three substantive claims (two for discrimination and one for retaliation), the jury was given only two interrogatories relating to the claims and one relating to damages. The district court lumped together the two claims of discrimination, notwithstanding their separate factual bases.

[20] Dr. Vadie was also awarded interest on that sum at a rate of 4.730% per annum.

filed a post-judgment motion for reinstatement to a position at MSU. This motion was also denied. Both parties appealed.

## II

On appeal, MSU contends that the district court erred in denying its motions for judgment as a matter of law made at the close of Dr. Vadie's case, at the close of all the evidence, and after the verdict was returned, at which time it alternatively sought a new trial. MSU first argues that Dr. Vadie's claim of discrimination with respect to the 1993 faculty positions was time-barred. MSU further asserts that, in any event, it was entitled to judgment as a matter of law because none of Dr. Vadie's claims were supported by sufficient evidence. Finally, MSU contends that the compensatory damages award was excessive. Dr. Vadie, on the other hand, appeals the district court's denial of his motion for reinstatement.

## A

We begin with the question of the timeliness of Dr. Vadie's claim as to the 1993 position openings. Title VII requires persons claiming discrimination to file a charge with the EEOC within 180 days after the allegedly discriminatory practice occurs. 42 U.S.C. § 2000e-5(e). The period begins to run from the time the complainant knows or reasonably should have known that the challenged act has occurred. *Hamilton v. General Motors Corp.*, 606 F.2d 576, 579 (5th Cir. 1979), *reh'g denied*, 611 F.2d 882 (5th

9

Cir.), *cert. denied*, 447 U.S. 907, *reh'g denied*, 449 U.S. 913 (1980).

MSU argues that the alleged adverse employment action occurred in May 1993 when Dr. Vadie was first notified of his non-selection. Since his EEOC charge was not filed until January 1995, MSU is of the view that it was not timely. Both the district court and Dr. Vadie used November 17, 1994, the date of the letter from MSU's Board, as the date which started the 180-day clock running. We conclude that neither MSU nor the district court selected the correct date.

Dr. Vadie received a letter from Dr. Hill dated May 20, 1993, which stated: "We appreciated the opportunity to discuss with you an available faculty position in the Department of Chemical Engineering. While we are unable to extend an offer to you at this time, we will continue to consider your application along with those of other candidates, unless you indicate a desire for us not to do so." P-8. At the time, MSU had been considering only internal candidates, such as Dr. Vadie, who were being displaced by the closing of the Petroleum Engineering Department. Two of the three open positions were filled in that manner. Dr. Hill informed Dr. Vadie that he was not one of those chosen; however, it is clear that he was to remain under consideration as MSU broadened its search to include outside applicants.

10

The third faculty vacancy in the Chemical Engineering Department was ultimately filled in June 1994 by an outside applicant, Dr. Nancy Losure. There is nothing in the record to suggest that Dr. Vadie received any formal rejection letter at that time; however, it is apparent that he knew Dr. Losure had been chosen to fill the third position because he appealed to MSU's Board of Trustees. On November 17, 1994, he received a letter from the Board's counsel indicating that in executive session the Board had "voted unanimously to support the position of [MSU]." P-10.

Prior to the June 1994 hiring of Dr. Losure, notwithstanding the May 20, 1993 letter of Dr. Hill, Dr. Vadie could still have held the legitimate expectation that he might be selected for the third position. Once Dr. Losure was hired, Dr. Vadie knew or should have known that he had lost his bid for any of the three faculty vacancies. Since he believed that he had been passed over due to considerations of race and/or national origin, it was then that his claim accrued and the 180-day clock began to run. Dr. Vadie's filing of his EEOC charge in January of 1995 was simply too late.

It was error for the district court to permit Dr. Vadie's claim of discrimination related to the 1993 position openings to proceed. That claim should have been dismissed early on and should never have reached the jury.

11

Accordingly, we vacate the judgment of the district court against MSU with respect to Dr. Vadie's claim of discrimination relating to the 1993 position openings and remand with instructions to dismiss that claim.

B

MSU also challenges the judgment with respect to the position vacancy in 1995. MSU is of the view that it was entitled to judgment as a matter of law on that claim because there was insufficient evidence to prove either discrimination or retaliation.

"A motion for judgment as a matter of law ... in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir.), *reh'g and suggestion for reh'g en banc denied*, 49 F.3d 730 (5th Cir. 1995). "On review of the district court's denial of such a motion, the appellate court uses the same standard to review the verdict that the district court used in first passing on the motion." *Id*.

A jury verdict must be upheld unless "there is no legally sufficient evidentiary basis for a reasonable jury to find" as it did. Fed. R. Civ. P. 50(a)(1). "We test jury verdicts for sufficiency of the evidence under the standards set forth in *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107

12

F.3d 331 (5th Cir. 1997) (en banc), viewing all of the evidence and drawing all reasonable inferences in the light most favorable to the verdict." *Scott v. University of Mississippi*, 148 F.3d 493, 504 (5th Cir. 1998) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (en banc), quoting *Boeing*, 411 F.2d at 374).[21]

1

"The 'factual inquiry' in a Title VII case is '[whether] the defendant intentionally discriminated against the plaintiff.'" *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also*, *Barnes v. Yellow Freight Systems, Inc.*, 778 F.2d 1096, 1099 (5th Cir. 1985) (the question is whether the employer's action "was discriminatory and a violation of Title VII"). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253. An employer is entitled to judgment as a matter of law on this ultimate question "if the evidence taken as a whole would not

---

[21] Under *Boeing*, "there must be a conflict in substantial evidence to create a jury question." 411 F.2d at 375. Substantial evidence is "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Boeing*, 411 F.2d at 374; *see also* *Krystek v. University of Southern Mississippi*, 164 F.3d 251, 255 (5th Cir.1999).

allow a jury to infer that the actual reason for the [employer's decision] was discriminatory." *Rhodes*, 75 F.3d at 994.

With respect to the 1995 discrimination claim,[22] the specific question the jury had to resolve was whether MSU's decision-makers denied a faculty position to Dr. Vadie because of his national origin. Dr. Vadie offered absolutely no evidence of national origin discrimination. In fact, the record shows that the faculty that made the decision in 1995 was ethnically diverse and the applicant chosen over Dr. Vadie was of Hispanic origin.

The only evidence which Dr. Vadie offered is that he made a prima facie case by establishing his Iranian ancestry. However, once a case has been fully tried, the presumption created by a prima facie showing "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Aikens*, 460 U.S. at 715 (quoting *Burdine*, 450 U.S. at 255).

Viewing the evidence as a whole, as we must, there is nothing probative anywhere in the record of the ultimate question of national origin discrimination. Dr. Vadie argued that Dr. Zappi, who had no teaching experience, was not qualified for the 1995 position and was certainly no match for Dr. Vadie's own record of success in research and teaching. He further asserted that when MSU advertised for the 1993 positions, a Ph.D. in chemical

---

[22] We need not consider the merits of any discrimination claim relating to the 1993 positions because, as already noted, any such claim was time-barred.

14

engineering was not required and that the addition of such a requirement for the 1995 position was pretextual.

We will assume, of course, that this was believed by the jury. All that it proves, however, is that MSU's decision-makers had some unidentifiable reason for not wanting to hire Dr. Vadie. The evidence has no probative value with respect to the ultimate question before the jury of whether there was discrimination based on national origin, an essential element for Dr. Vadie to prove. There simply is not a scintilla of evidence that Dr. Vadie's national origin played any role in any decision that the defendant made with respect to him during his tenure.[23] There is no

---

[23] We have considered the application of the Supreme Court's recent decision in *Reeves v. Sanderson Plumbing Prods.*, No. 99-536, 2000 WL 743663 (U.S. June 12, 2000) and find that it does not affect the law applicable to this case. Our study of *Reeves* convinces us that our panel opinion in that case was simply inconsistent with our en banc decision in *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993-94 (5th Cir. 1993) (en banc), and that the Supreme Court, in deciding *Reeves*, plainly affirmed that en banc precedent. Indeed, in *Rhodes* we specifically stated:

> The factfinder may rely on all the evidence in the record to draw this inference of discrimination. In tandem with a prima facie case, the evidence allowing rejection of the employer's proffered reasons will often, perhaps usually, permit a finding of discrimination without additional evidence. Thus, a jury issue will be presented and a plaintiff can avoid summary judgment and judgment as a matter of law if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that age was a determinative factor in the actions of which plaintiff complains.

(continued...)

15

evidence in the record that the defendant ever adversely considered

---

[23](...continued)
75 F.3d at 994.  This holding is consistent with *Reeves*.  *See, e.g.*, *Reeves*, 2000 WL 743663 at *9 ("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").  Furthermore, as the Supreme Court held in *Reeves*:

> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.  Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id*.  We made a similar observation in *Rhodes*.  *See* 75 F.3d at 994.  We hold therefore that *Rhodes* is consistent with *Reeves* and continues to be the governing standard in this circuit.  This appeal falls within the exception noted by *Reeves* and *Rhodes*.

Moreover, the facts of this appeal are clearly distinguishable from the facts in *Reeves*.  Indeed, this case falls within the exception noted above in which the plaintiff fails to make an adequate showing.  In *Reeves* the Supreme Court reversed on the basis that the appellate panel failed to take into account the plaintiff's evidence supporting his prima facie case when considering the overall sufficiency of the evidence to support his age discrimination claim.  The Supreme Court noted substantial evidence demonstrating that the employer's explanation for his firing was patently false, *id*. at *7, and pointed to comments and conduct of the defendant's supervisor reflecting an age-related animus.  *Id*. at *12.  Here, there is no comparable evidence to call into question MSU's 1995 hiring decision.  Thus, Vadie fails to meet the standard of *Reeves* that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. at *6.

16

national origin with respect to any of its faculty. To the contrary, the chemical engineering faculty was diverse.

MSU was entitled to judgment as a matter of law on this claim and it was error for the district court to deny MSU's motion.

Accordingly, we vacate the judgment of the district court against MSU with respect to Dr. Vadie's claim of discrimination relating to the 1995 position opening and remand with instructions to enter judgment in favor of MSU on that claim.

2

MSU also challenges the sufficiency of the evidence to support a claim of retaliation with respect to the 1995 position.[24] Dr. Vadie argues that he was not selected for that position in retaliation for his having filed charges of discrimination and for filing this lawsuit.

Title VII makes it unlawful for an employer to discriminate against an employee "because [that employee] has opposed any practice made un unlawful employment practice by this subchapter, or because he has made a charge ... under this subchapter." 42 U.S.C. § 2000e-3(a). The plaintiff has the ultimate burden of "showing that 'but for' the protected activity, the [adverse

---

[24] There is no requirement that a plaintiff must prevail on any underlying claim of intentional discrimination in order to prevail on a claim of retaliation. Similarly, evidence sufficient to support a claim of retaliation is not necessarily sufficient to support a claim of discrimination. *Shackelford v. Deloitte & Touche LLP*, 190 F.3d 398, 405 n.4 (5th Cir. 1999).

17

employment action] would not have occurred, notwithstanding the other reasons advanced by the defendant." **McMillan v. Rust College, Inc.**, 710 F.2d 1112, 1116 (5th Cir. 1983); *see also* **Long v. Eastfield College**, 88 F.3d 300, 305 n.4 (5th Cir. 1996) ("even if a plaintiff's protected conduct is a substantial element in a defendant's [adverse employment] decision ..., no liability for unlawful retaliation arises if the [same decision would have been made] even in the absence of the protected conduct").

We look again at the record as a whole to determine whether there is sufficient evidence to support a jury verdict of retaliation. The ultimate question is whether a reasonable jury could conclude that Dr. Vadie would have been selected for the 1995 faculty position had he not sued MSU. In other words, does the evidence support a finding that "but for" Dr. Vadie's protected activity, he would have gotten the job?

MSU asserts that Dr. Vadie would not have been selected for the 1995 position regardless of whether or not he had engaged in any protected activity because he did not meet one of the requirements: namely, he did not have a doctorate in chemical engineering. Dr. Vadie is of the view that this position requirement was manufactured as a retaliatory means of eliminating him from the field of applicants.

We agree that a reasonable jury, drawing all inferences in Dr. Vadie's favor, could reach that same conclusion on the evidence

18

contained in this record, which shows that (1) after Dr. Vadie was notified in May of 1993 that he had not been selected for any of the three open positions, he filed a grievance with the University Board; (2) the faculty, excluding Dr. Hill, who had the role of making the final hiring recommendation to the Dean, wrote a letter to the Dean of the College of Engineering in September 1993 protesting the raising of "certain questions" as to its wishes with respect to the "relocation of tenured faculty and untenured faculty members to the chemical engineering department" and insisting that it was satisfied with and accepted the administration's hiring decisions in that regard; (3) the faculty, including Dr. Hill, wrote an even more pointed letter to the Dean dated April 22, 1994 criticizing the "rumor mill [which] continues to grind out the rhetoric[ ]" and clearly stating that the faculty and the head of the department "do NOT want Dr. Alex Vadie in this program[;]" (4) although this April 1994 letter also makes reference to three specific "Hall of Fame members" who would be "less than pleased" if Dr. Vadie were hired, Dr. Toghiani, a faculty member who signed the letter and who personally knew each of the three named people, testified that she had no idea why that had been included in the letter since there was never any discussion at any faculty meeting about this subject; (5) Dr. Hill testified that he did not recall who actually drafted the April 22nd letter, but Dr. Toghiani indicated that each faculty member was give a copy prior to the

19

faculty discussion finalizing the letter's wording and was then asked to stop by Dr. Hill's office to sign it; (6) in November of 1994, MSU's Board confirmed its support for Dr. Vadie's non-selection for any of the 1993 position openings; (7) the November 1994 issue of the ADVOCATE reported the Board's decision and indicated Dr. Vadie's declared intent to pursue legal remedies; (8) Dr. Hill testified that this article had had an "emotional impact" on the faculty; (9) in January 1995, Dr. Vadie filed his first charge of discrimination with the EEOC; (10) in June 1995, Dr. Vadie filed his lawsuit; (11) in August 1995, a chemical engineering faculty member died, leaving a new opening in the department; (12) Dr. Hill testified that the entire faculty met to identify the qualifications to be included in the advertisement for the position opening and specifically decided to require a doctorate in chemical engineering, unlike the advertisements for the 1993 job openings which required a doctorate only in a related field; (13) as a result of this new requirement, Dr. Vadie, whose application remained on file from 1993 and who had made known his interest in the new job opening, was the only applicant who was "disqualified" for the 1995 opening; (14) the list of recommended applicants for the 1995 job given by the search committee to Dr. Hill did not include Dr. Vadie; (15) a position that was open in the department at the time of the trial once again did not require a doctorate in chemical engineering; (16) MSU had a policy of

20

hiring displaced faculty members but, inexplicably, failed to apply that policy to Dr. Vadie, a man who indisputedly had a significant record of teaching and research at the University; and (17) although Dr. Vadie technically did not have the requisite doctorate in chemical engineering, he was as close to that degree as one could get.

Examining all of this evidence <u>in a light most favorable to Dr. Vadie</u>, a reasonable jury could conclude that, more likely than not, "but for" his protected activity and the negative reaction to it by Dr. Hill and the chemical engineering faculty, the University would have found that Dr. Vadie's strengths greatly outweighed the technical lack of a chemical engineering degree and would have awarded him the 1995 position in the Chemical Engineering Department.

Accordingly, we conclude that the district court did not err in denying judgment as a matter of law on the retaliation claim. The judgment of the district court against MSU on that claim is affirmed.

C

The final challenge by MSU is to the compensatory damages awarded to Dr. Vadie. MSU asserts that the award, even as reduced by the district court, was excessive and contrary to the evidence. Our review of mental anguish damages is for abuse of discretion. *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046 (5th Cir. 1998).

The jury returned a verdict of $350,000, which the district court reduced to $300,000 in light of the statutory caps. *See* 42 U.S.C. § 1981a(b)(3)(D). Ordinarily, a jury verdict will be considered excessive only if it is "contrary to right reason" or "entirely disproportionate to the injury sustained." *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995). Here, the jury found that Dr. Vadie was the victim of both discrimination and retaliation and, presumably, awarded damages based on that. Since we have overturned any verdict of discrimination, to withstand appeal, the $300,000 award must be able to be supported on the evidence of injury related to the retaliation claim alone.[25]

Our analysis must be guided by *Carey v. Piphus*, 435 U.S. 247, 248 (1978), where the Supreme Court held that to recover more than nominal damages for emotional harm there must be "proof of actual

_____

[25] On a related point, the $300,000 award might also be sustained despite the elimination of the discrimination claim if it could be found to include a claim for lost future income. In fact, when the district court denied Dr. Vadie's post-judgment motion for reinstatement, it noted that an alternative to reinstatement would be front pay but that such an award here "would be inappropriate -- and excessive -- considering the Plaintiff's large award of compensatory damages." The district court implied that it let stand the large award because of the possibility that it encompassed lost future income. The problem with this reasoning is that Dr. Vadie has admitted that he made no claim for front pay since he has been hired by MSU in a different capacity. In fact at the conference which took place on the record in chambers where the district court and counsel worked out the jury instructions, Dr. Vadie's counsel was adamant that there was no claim for front pay and, therefore, there should be no instruction on mitigation of damages. Therefore, front pay cannot be used to justify the size of the award.

injury" resulting from the illegal conduct.  As recently discussed in ***Brady v. Fort Bend County***, 145 F.3d 691 (5th Cir. 1998), *cert. denied*, 525 U.S. 1105 (1999), our court has "set out to clarify the level of specificity required under ***Carey***."  ***Id***. at 718 (citing ***Patterson v. P.H.P. Healthcare Corp.***, 90 F.3d 927 (5th Cir. 1996), *cert. denied*, 519 U.S. 1091 (1997)).  In ***Patterson***, we addressed two aspects of the proof necessary to support mental anguish damages.[26]

> First, we articulated the level of specificity needed to prove a claim for mental damages under ***Carey***.  We held that there must be a "specific discernable injury to the claimant's emotional state," ***Patterson***, 90 F.3d at 940, proven with evidence regarding the "nature and extent" of the harm, ***id***. at 938.  We acknowledged that "hurt feelings, anger and frustration are part of life," and were not the types of harm that could support a mental anguish award. ***Id***. at 940. And our language describing the specificity standard was unequivocal; that standard must be met before mental anguish damages can be awarded. *See* ***id***. at 938 (holding that plaintiff "must" present such evidence).

> Second, we addressed the types of evidence that may be used to clear that hurdle.  We observed that in proving mental damages "a claimant's testimony alone *may* not be sufficient to support anything more than a nominal damage award." ***Id***. at 938 (emphasis added).  We noted that ***Carey*** requires evidence

---

[26]    We noted in ***Patterson*** that although ***Carey*** addressed damages awarded in actions brought under 42 U.S.C. § 1983, there was no reason to confine its reasoning solely to those cases. Rather, ***Carey*** is applied to all "cases involving federal claims for emotional harm." ***Patterson***, 90 F.3d at 938 n.11.

23

that "may include corroborating testimony or medical or psychological evidence." *Id*. at 940 (emphasis added). Likewise, we turned to the Equal Employment Opportunity Commission's (EEOC) official guideline statement for guidance. EEOC POLICY GUIDANCE NO. 915.002 § II(A)(2) (July 14, 1992). That document provides:

> Emotional harm will not be presumed simply because the complaining party is a victim of discrimination. The existence, nature, and severity of emotional harm must be proved. Emotional harm <u>may</u> manifest itself, for example, as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown. Physical manifestations of emotional harm <u>may</u> consist of ulcers, gastrointestinal disorders, hair loss, or headaches.... The Commission will <u>typically</u> require medical evidence of emotional harm to seek damages for such harm in conciliation negotiations.

> *Id*. at 10-12 (footnotes omitted) (emphasis added).

*Brady*, 145 F.3d at 718.[27]

In *Brady*, we cited with approval a sister circuit's "magnum opus on the evidence needed to support compensatory damages for emotional distress." *Id*. (citing *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997)). "The *Price* court ... conducted a comprehensive survey of circuit

---

[27]    The judgment in the instant case below was entered on October 1, 1998, well after our decisions in *Patterson* and *Brady*.

24

case law addressing the circumstances in which a plaintiff's own testimony was found sufficient, and the circumstances in which that testimony was found insufficient." *Brady*, 145 F.3d at 718 (citing *Price* 93 F.3d at 1251). The Fourth Circuit concluded:

> ... a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation; however, the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages, In marshaling the evidence necessary to establish emotional distress resulting from a constitutional violation, *Carey* instructs us that "genuine injury" is necessary. *Carey*, 435 U.S. at 264, 98 S.Ct. at 1052.

*Price*, 93 F.3d at 1254.

In this case, Dr. Vadie's own testimony is the sole source of evidence on emotional injury. His brief testimony was as follows:

> Q. All right. Dr. Vadie, let me ask you this: When you did not get this job as a professor in the Chemical Engineering Department -- you were saying you love Mississippi State University -- how did it affect you or how did it make you feel so far as your worrying and anxiety over that was concerned? Describe that for the jury.
>
> A. ... It destroyed me. It totally ruined me, and I become sick, totally ill, physically, mentally, and everything. I took many doctors, many pills.
>
> I did not know what to do, where to go, what to say. I did not know whether it was nighttime or daytime. I could not sleep for

25

> months at a time. Headache, nausea. Still I am under severe doctor surveillance because of what they have done to me. ...

R6:263-64. Although none of Dr. Vadie's testimony was corroborated by medical evidence or any other witness, such failure is not necessarily fatal if the evidence is otherwise sufficient to support an award of damages. *See, e.g.*, **Migis v. Pearle Vision, Inc.**, *supra* ($5000 compensatory damages award upheld on the strength of plaintiff's testimony alone).

Dr. Vadie's testimony was sufficient to support a finding of actual injury. It was, however, insufficient to support damages of the magnitude awarded here, especially in view of the fact that there has been no claim for front pay. In other words, the award is entirely disproportionate to the injury sustained. Therefore, it was error for the district court to deny MSU's motion for a new trial.

Although we note that MSU did not ask for remittitur when it sought judgment as a matter of law or, in the alternative, a new trial after the jury rendered its verdict, it would have been within the district court's discretion to sua sponte suggest remittitur. This Court has the same power. *See, e.g.*, **McDonald v. Bennett**, 674 F.2d 1080, 1092 (5th Cir.), *on rehearing*, 679 F.2d 415 (5th Cir. 1982).

Since the $300,000 award of compensatory damages on the retaliation claim alone cannot withstand scrutiny, we vacate that

26

judgment.  On this record, which is devoid of any medical evidence supporting any injury and which is devoid of any specific evidence whatsoever supporting Dr. Vadie's broad assertions of emotional injury, we find that an award greater than $10,000 would be excessive.  At a new trial, perhaps Dr. Vadie can make a better record substantiating his claims of injury.[28]  Therefore, we will remand for a new trial on retaliation damages <u>unless</u> Dr. Vadie accepts a remittitur in the amount of $290,000, reducing the damages award to $10,000.

D

Dr. Vadie has appealed the district court's denial of his post-judgment motion for reinstatement.  We find no error to the extent that the district court ruled that "reinstatement" would be inappropriate and, therefore, we affirm that ruling.[29]

III

For the reasons stated above, we VACATE the judgment of the district court to the extent that it found illegal discrimination on the basis of race and/or national origin and we REMAND with instructions to dismiss the 1993 claim and to enter judgment in

---

[28]    MSU has also challenged various evidentiary rulings made by the district court.  We find no error in any of those rulings. However, in the event of a new trial on remand, we see no reason why either party could not ask the district court to reconsider its rulings on those matters bearing on the specific question of retaliation damages and/or mitigation of those damages.

[29]    As already noted, we overrule the district court's order of December 10, 1998, with respect to its finding that the damages award was not excessive.

27

MSU's favor on the 1995 claim.  We AFFIRM the judgment with respect to the retaliation claim.  We VACATE the compensatory damages award of $300,000 and we REMAND for a new trial on retaliation damages unless Dr. Vadie accepts, within twenty (20) days of the date of the mandate, a remittitur in the amount of $290,000, reducing the compensatory damages award against MSU to $10,000.  Finally, we AFFIRM the district court's denial of reinstatement.

DeMOSS, Circuit Judge, concurring in part and dissenting in part:

I concur in part II.A. of the majority opinion, which determines that Vadie's claim of racial or national origin discrimination relating to the 1993 position openings was not timely filed and should have been dismissed by the district court and never submitted to the jury. I also concur in part II.B.1. of the majority opinion, which determines that no reasonable jury could conclude on the record in this case that intentional national origin discrimination was the basis for the denial of the 1995 faculty position to Vadie and that it was error for the district court to deny MSU's motion for judgment as a matter of law on this claim. I also concur in that part of part II.C. of the majority opinion, which determines that the jury's award of $350,000 (which the district court reduced to $300,000 in light of the statutory caps) as compensatory damages "for emotional pain, suffering, inconvenience, or mental anguish" was disproportionate to the injuries sustained and that, therefore, it was error for the district court to deny MSU's motion for a new trial on this ground. Finally, I concur in part II.D. of the majority opinion, which affirms the district court ruling that Vadie was not entitled to reinstatement under the facts of this case.

29

I am not able to concur and therefore respectfully dissent as to the majority's determination in part II.B.2. that the evidence in this case was sufficient to support the jury finding that MSU retaliated against Vadie and as to that portion of part II.C. holding that Vadie's testimony as to emotional injury was sufficient to support an award of $10,000 as damages for emotional injuries resulting from the retaliation claim. I write, therefore, in detail to set forth my dissenting views.

**The Retaliation Claim**

In his complaints filed herein, Vadie asserted two, and only two, protected activities as the basis for his retaliation claim: first, his filing of a charge of discrimination under Title VII with the EEOC in January 1995, and second, his filing of his first complaint in this lawsuit in June 1995. Regarding those two asserted activities, Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge . . . or participated in any manner . . . in a[] hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added). A retaliation claim, therefore, has three elements: (1) the employee engaged in an activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and

30

the adverse employment action. *See* **Mattern v. Eastman Kodak Co.**, 104 F.3d 702, 705 (5th Cir. 1997) *(*citing **Shirley v. Chrysler First, Inc.**, 970 F.2d 39, 42 (5th Cir. 1992)). There is no dispute in this case that Vadie's filing of a discrimination charge with the EEOC in January 1995 and his filing of this suit in June 1995 are protected activities. Likewise, there is no dispute in this case that MSU's decision not to hire Vadie to fill the faculty vacancy that occurred in August 1995 can be considered an adverse employment decision. The validity or not of the retaliation claim turns then on whether Vadie proved that the adverse employment decision was causally related to the protected activity.

It is very clear under our case law that Vadie has the ultimate burden of showing "that 'but for' the protected activity, the [adverse employment action] would not have occurred, notwithstanding the other reasons advanced by the defendant (employer)." **McMillan v. Rusk College, Inc.**, 710 F.2d 1112, 1116 (5th Cir. 1983)*; see also* **Long v. Eastfield College**, 88 F.3d 300, 305 & n.4 (5th Cir. 1996) ("[E]ven if a plaintiff's protected conduct is a substantial element in a defendant's [adverse employment] decision . . ., no liability for unlawful retaliation arises if [the same decision would have been made] even in the absence of the protected conduct.").

Dr. Vadie argues that he was not selected for the position that became available in 1995 in retaliation for his having filed

31

charges of discrimination and for filing this lawsuit. MSU asserts that Dr. Vadie was not selected in 1995 because he did not possess the requisite doctorate in chemical engineering, and that this legitimate, non-discriminatory and non-retaliatory reason would have been applied even if Dr. Vadie had not filed his charges of discrimination or this lawsuit. Vadie responds that MSU changed the position requirements in 1995 solely to exclude him from consideration; in other words, he argues that MSU's articulated reason for this non-selection is a mere pretext for retaliation.

From my review of this record, I am satisfied that there is no basis whatsoever for a finding of pretext as to the doctorate in chemical engineering requirement. The testimony from the members of the faculty selection committee is uncontradicted that this requirement was determined to be necessary by the faculty committee in order to replace the academic credentials of the professor whose death created the vacancy in 1995, that this requirement was expressly stated in public notices about this opening, that this requirement was routinely applied to all applications for this 1995 vacancy, that the individuals selected by the faculty selection committee to be recommended to the Dean of the Engineering School each satisfied this requirement of a doctorate in chemical engineering, and that Dr. Zappi who was ultimately selected by the Dean of Engineering did in fact have a doctorate in chemical engineering.

32

Vadie did not produce any testimony or record evidence upon which a jury could find that the requirement for a doctorate in chemical engineering was false or not truthful or was not in fact applied. Likewise, Vadie did not produce any evidence, either oral or documentary, that the faculty selection committee that established the requirement of a doctorate in chemical engineering considered or talked about the facts that Vadie had filed a claim with the EEOC or had filed this lawsuit. Each of the members of the faculty selection committee testified that during the selection committee's deliberations, no one talked about Vadie, nor about Vadie's having filed an EEOC claim, nor about Vadie's having filed this lawsuit. There is, in short, no evidence or testimony that contradicts in any way the evidence of the faculty selection committee as to the need for the doctorate in chemical engineering requirement and the absence of retaliatory actions insofar as Dr. Vadie's application was concerned. As the majority notes in part II.B. of its opinion, "'there must be a conflict in substantial evidence to create a jury question.'" Majority opinion at footnote 21 (quoting **Boeing**, 411 F.2d at 375). For the same reason that we disposed of Vadie's national origin discrimination claim and concluded that such claim fits easily within the exceptions contemplated by both **Rhodes** and **Reeves**,[30] I would conclude that his retaliation claims should also be denied.

---

[30]    *See* footnote 23 of Majority Opinion.

Given the absence of a substantial conflict as to pretext or retaliation, I think the majority errs in relying upon inferences that might be drawn in order for a reasonable jury to reach a conclusion that the doctorate in chemical engineering requirement "was manufactured as a retaliatory means of eliminating [Vadie] from the field of applicants." *See* Majority opinion, part II.B.2. The majority comes up with a laundry list of 17 items of evidence that it claims supports a conclusion in Dr. Vadie's favor on the retaliation claim. The first eight items relate to events which occurred in 1993 and 1994, prior to the filing by Vadie of his EEOC charge in January 1995, and more critically revolve around the initiation by Vadie of a grievance under internal procedure of the University which he never identified as being a protected activity under Title VII.[31] I frankly disagree with the majority's assertion that these events, all of which occurred before Vadie engaged in any protected activity, can nonetheless support a reasonable inference that MSU retaliated against Vadie because he later engaged in a protected activity.[32] The next four (9-12) of these 17 items simply recite the time frame in which certain events

---

[31] The record is completely void of any evidence that Vadie's internal grievance was premised upon anything made unlawful by Title VII, and therefore does not support the inference that Vadie's retaliation claim could be based on this conduct.

[32] Some retaliation cases have relied upon testimony indicating a prospective threat: i.e. "If you want to keep your job here you shouldn't file any claim with the EEOC over this incident." No such testimony exists in this record.

occurred and are absolutely neutral as to any inferences to be drawn therefrom. The remainder of these 17 items describe circumstances that have meaning insofar as retaliation is concerned only if you assume that the requirement of a doctorate in chemical engineering was a false one, or if you assume that a faculty selection committee must have one and only one criteria for filling faculty vacancies which cannot be changed in light of the individual circumstances of each particular decision.

I must also register my dissent from the ultimate conclusion of the majority set forth on page 20 of the Majority Opinion, that a jury could reasonably find that MSU "would have found that Dr. Vadie's strengths greatly outweighed the technical lack of a chemical engineering degree and would have awarded him the 1995 position in the Chemical Engineering Department 'but for' his protected activity." That conclusion is directly in conflict with the content of the April 22, 1994 letter from the faculty of the Chemical Engineering Department to the Dean of the Engineering School and with the November 17, 1994 letter from MSU's Board to Vadie, both of which are described in the majority opinion. Both of these communications were sent prior to the date of Vadie's first protected activity, i.e. Vadie's January 1995 EEOC claim, and could not possibly reflect any retaliatory motive on the part of the faculty selection committee in late 1995. These communications indicate a decision on the part of the faculty that it did not want

35

Dr. Vadie in the chemical engineering program and that his presence would be "highly counterproductive;" and a decision on the part of the Board that it unanimously supported the faculty decision. To conclude as the majority does that, if Dr. Vadie had not filed his EEOC claim or filed this lawsuit he would have been awarded the 1995 position, is just flatly contradicted by these letters; and no reasonable jury could reach such a conclusion on the basis of this record.

Simply put, I do not believe that Dr. Vadie has put forth sufficient evidence for the jury to use in rejecting MSU's proffered legitimate, non-discriminatory and non-retaliatory reason for not selecting Dr. Vadie for the 1995 faculty position. *See* ***St. Mary's Honor Ctr. v. Hicks***, 509 U.S. 502, 507-508 (1993); ***Texas Dep't of Community Affairs v. Burdine***, 450 U.S. 248, 256 (1981).

Finally, I note that in this case, counsel for Vadie gave only a perfunctory discussion of the retaliation claim in his opening argument to the jury, and in his closing argument to the jury, counsel for Vadie did not discuss the elements of a retaliation claim nor did he comment on evidence and testimony which would support a finding on the retaliation claim. From my reading of this record, I am convinced that this case was tried on the basis of Vadie's claims for racial or national origin discrimination and that the retaliation claim was an incidental, tag-along claim that counsel for Vadie never pressed either factually or legally.

36

Likewise, I note that the district court, in its order denying MSU's post-trial motions, did not even mention, let alone address, MSU's contention that the jury's verdict with respect to retaliation was unsupported by the evidence. Instead, the district court stated rather succinctly "the Court is of the opinion that a jury could reasonably conclude that Mississippi State University discriminated against the plaintiff based on his national origin or race." Accordingly, I register my dissent from the rationale and reasoning utilized by the majority to breathe life into this unavailing retaliation claim.

### Emotional Damages

Early on in its discussion of damages, the majority states:

> Since we have overturned any verdict of discrimination, to withstand appeal, the $300,000 award must be able to be supported on the evidence of injury related to the retaliation claim alone.

If the majority had truly adhered to this statement, they would have concluded that the evidence of injury and damage resulting from the retaliation claim is totally absent. The majority recognizes that Vadie's own testimony is the sole source of evidence on emotional injury and that emotional injury is the sole basis on which Vadie claims damages. The majority's quotation from Vadie's testimony is the sum total of all testimony on emotional injury and damages in this record. In my view, this case should be controlled by the opinion of this Court in *Brady v. Fort Bend*

37

*County*, 145 F.3d 691 (5th Cir. 1998), *cert. denied,* 119 S. Ct. 873 (1999). In that case, the majority of the panel affirmed the district court's decision eliminating jury awards for mental anguish damages ranging from $10,000 to $25,000. *See id*. at 717-720. In *Brady*, we established the test for reviewing an award of damages for mental anguish, when that award is based solely upon the plaintiff's own testimony. That test is:

> Under *Patterson*, it does not matter what type of evidence is used to satisfy *Carey*'s specificity requirement, so long as that standard is successfully met. When a plaintiff's testimony is particularized and extensive, such that it speaks to the nature, extent, and duration of the claimed emotional harm in a manner that portrays a specific and discernable injury, then that testimony alone may be sufficient.

*Id*. at 720. In my view, Vadie's testimony in this case is just like the testimony of the plaintiffs described in *Brady*, and we should, therefore, hold as we did in *Brady*:

> In sum, the Plaintiff's testimony in this case is vague, conclusory, and uncorroborated. Under *Carey*, *Patterson,* and *Price*, it cannot legally support mental anguish damages.

*Id.* at 720.

Not only is Vadie's damage testimony in this case insufficient under *Carey*, *Patterson* and *Price*, it clearly does not speak to any damages whatsoever arising from the retaliation claim. I note that the majority's quote of Vadie's testimony contains an ellipsis indicating omitted text. That omitted text reads as follows:

38

I worked for six years in the Mississippi State
University and I worked very hard to get my tenure
and during that time and even after that I rejected
offers from oil industries because I wanted to be
in Mississippi State University and I wanted a
secure future. And that's exactly what I did. But
in 1992, 1993, when because of no fault of your's
they throw you out, they fire you, because of some
-- some problem with the department or whatever
then obviously you see no future. Everything that
you worked for for years and years and years
totally destroyed.

In context, therefore, Vadie's testimony about emotional

damages relates to the decision of MSU to close down the Department

of Petroleum Engineering in 1992 and 1993 and the decisions made in

1993 which resulted in Vadie not being hired on in the Chemical

Engineering Department. There is no later testimony whatsoever by

Vadie as to emotional injuries or damages resulting from his

failure to be hired in 1995 as a replacement for the professor in

the Chemical Engineering Department who died, nor is there any

later testimony by Vadie as to his emotional injuries and damages

relating to his claim of retaliation. Consequently, there is no

evidence whatsoever to support any finding of emotional damages

from his retaliation claim, and I respectfully dissent from the

decision of the majority to remand for a new trial on retaliation

damages unless Vadie accepts a remittitur in the amount of

$290,000, reducing the damages award to $10,000. Likewise, I

dissent from the gratuitous statement included in the majority's

opinion that perhaps Vadie can make a better record substantiating

his claims of injury at a new trial. In my view, Vadie has already

39

had his day in court, and his proof on both liability and damages in connection with his retaliation claim is not sufficient.

For all the foregoing reasons, I would reverse the judgment of the district court and render judgment that Vadie take nothing from MSU in this cause of action.